IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

14 CV 6503

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
JAMES RIST,                                         :
                                                    :
                              Plaintiff,            :
                                                    :
          -against-                                 :
                                                    :
HSBC SECURITIES (USA) INC.,                         :
                                                    :
                              Defendant.            :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RECEIVED
AUG 1 4 2014
S.D.C. S.D.N.Y.

COMPLAINT

      Plaintiff, James Rist, through his attorneys, Liddle & Robinson, L.L.P., for his Complaint

against Defendant HSBC Securities (USA) Inc., alleges:

                              **THE PARTIES**

      1.    Plaintiff James N. Rist is a 50-year-old male who resides in New York, New

York.  He obtained his undergraduate Bachelor of Science degree from Southern Connecticut

State University in 1986, with a major in Economics and a concentration in Finance.  From

September 2010 until May 13, 2014, Rist was employed by Defendant HSBC Securities (USA)

Inc. ("HSBC") at its midtown New York City headquarters, located at 452 Fifth Avenue, as

Senior Vice President and Emerging Markets Sales Trader in HSBC's Equity Finance Group,

with substantial involvement in the sale and financing of Latin American Securities.

      2.    Defendant HSBC Securities (USA) Inc. is organized under the laws of Delaware

with its principal place of business at 452 Fifth Avenue, New York, New York 10018.

1

**NATURE OF THE ACTION**

3.      This is a civil action for damages and remedies alleging unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Administrative Code of the City of New York, § 8-101 *et seq.* (the "New York City Human Rights Law" or "NYCHRL"); and the New York State Executive Law, § 290 *et seq.* (the "New York State Human Rights Law" or "NYSHRL").

**JURISDICTION AND VENUE**

4.      This Court has original subject matter jurisdiction over the Title VII claims asserted pursuant to 28 U.S.C. §§ 1331 and 1343 as they arise under the laws of the United States and are brought to recover damages for the deprivation of equal rights.

5.      This Court has supplemental jurisdiction over Rist's NYSHRL and NYCHRL claims under 28 U.S.C. § 1367, because these state law claims arise from a common nucleus of operative facts with the federal claims, and are so related to the federal claims that they form a part of the same case or controversy under Article III of the United States Constitution.

6.      Rist has exhausted his administrative remedies and complied with all statutory prerequisites to his Title VII claim. He filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on August 8, 2013, and was issued a Notice of Right to Sue on May 23, 2014. All prerequisites to the filing of this Complaint have been met.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because the Defendant conducts business and can be found in this district, and a substantial part of the events giving rise to Rist's claims occurred in the Southern District of New York.

## SUMMARY OF THE ACTION

8.      Rist was the victim of knowing, intentional retaliation by Defendant HSBC and senior executives that it employed. Such workplace retaliation is unlawful under federal, New York State, and New York City laws prohibiting employment discrimination. Workplace retaliation is a form of unlawful discrimination because the victim of retaliation is treated differently from employees who do not suffer retaliation.

9.      According to the EEOC, unlawful retaliation occurs when an employer takes an adverse action against an employee because that employee has opposed an unlawful employment practice by complaining to the employer about it, or by filing a charge of unlawful employment discrimination with the EEOC.  Rist engaged in both forms of protected activity following in close proximity by the acts of retaliation alleged here.

10.     The anti-retaliation provisions of the statutes listed above seek to prevent an employer from suppressing or interfering with an employee's efforts to advance the enforcement of equal employment opportunity, and to prevent injury to individuals who complain about or report unlawful employment practices.

11.     In early 2012, Rist began to date a female co-worker, identified here as "Jane Doe." Although Doe was an employee of HSBC, Rist was not her supervisor, and she did not report to him in any manner.

12.     By spring 2012, Rist learned from Doe that she was being sexually harassed by senior HSBC executives, including her supervisor, Eileen Hedges, Senior Vice President and Head of Business Development (Americas) ("Hedges").  On April 18, 2012, Rist complained to Hedges about her abusive treatment and sexual harassment of Doe, and complained that male

3

HSBC executives also had sexually harassed Doe with Hedges' encouragement.  Rist demanded that this sexual harassment, some of which he had personally witnessed, cease.

13.     On May 31, 2012, HSBC terminated Doe's employment, allegedly on the ground that she had falsely denied that she had been in a relationship with Rist.  In reality, HSBC terminated Doe's employment to prevent her from implicating senior HSBC executives, including Hedges, in the sexual harassment Doe had suffered.

14.     The next day, on June 1, 2012, Rist arranged a meeting with Ellen Weiss, Head of Human Resources for HSBC Global Markets.  Jennifer Whang of HSBC Human Resources also attended.  Rist complained that Doe had been subjected to pervasive sexual harassment during the course of her employment at the bank—facts that were well known to many HSBC employees.  Rist also complained that Doe's employment had been terminated in an attempt to cover up a culture of gender discrimination and sexual harassment of women at HSBC.

15.     Many senior executives at HSBC, including Rist's supervisors, became aware that Rist and others had complained to HSBC Human Resources about the sexual harassment of Doe. These executives include Pablo Pizzimbono, Head of Sales for HSBC Global Markets (Americas); Eileen Hedges; Tom O'Leary, Head of Equities (Americas); Suzy White, COO Global Markets (Americas); Warren McCormick, Head of Equity Finance (Americas); Rob Domanko, Senior Vice President in Equity Finance Sales; and Paul Busby, Head of US Prime Sales. They learned of Rist's complaints because Hedges, Weiss, and White openly disclosed the fact that Rist had made these complaints about the sexual harassment of Doe.

16.     In the months that followed, through 2012, 2013, and into 2014, in violation of federal and state law and its own Human Resources policies, HSBC retaliated against Rist by

taking a series of adverse actions against him that dramatically reduced his professional responsibilities and professional standing at HSBC, and his earning capacity.

17.     As news regarding Rist's complaints about the sexual harassment of Doe and her subsequent termination spread throughout the bank, Rist's supervisors stopped assigning him new client accounts, and began to treat him with open hostility. Rist's supervisor, McCormick, gave Rist an unsubstantiated low performance ranking for 2012. The amount of his annual bonus had been cut by over eighty percent by the end of 2013 from its 2011 level. Rist's supervisors circulated defamatory comments about Rist throughout the bank, excluded him from critical meetings, and reassigned his major client accounts to others. HSBC also stopped inviting Rist to client conferences specific to his expertise, instead selecting more junior members of his department to attend.

18.     HSBC's retaliation against Rist continued after he filed a Charge of Discrimination with the EEOC on August 8, 2013. These acts of retaliation included disparaging Rist to his superiors, advising colleagues to "stay away from him," casting Rist as a "bad influence," forcing Rist to report to a junior employee, further reassigning his accounts, and assigning Rist administrative tasks normally assigned to employees decades his junior.

19.     HSBC's retaliation against Rist became so severe that he was forced to resign his position in order to mitigate the damage his career was suffering as a result of HSBC's unlawful retaliation against him. This retaliation included baseless criticism, substantial reductions in his compensation, and a series of adverse changes in his accounts covered and his responsibilities, all of which became so intolerable that he was compelled to resign. Rist resigned his position at HSBC effective May 14, 2014.

20.    The unlawful retaliation described herein was undertaken by HSBC in knowing violation of federal, state, and local law, and in knowing disregard of HSBC Corporate Human Resources Policies specifically prohibiting such conduct.

21.    HSBC Human Resources Policies include the following **Fundamental Principle**:

> In all its endeavors, it is the policy of HSBC . . . to act honestly and fairly at all times. It is the Corporation's policy to comply with the spirit as well as the letter of all applicable laws and regulations in all that it does. Each employee of the Corporation is expected to do the same . . . All employees are responsible for ensuring that the working environment is free from any form of harassment, discrimination, or inappropriate behavior.

22.    HSBC Human Resources Policies thus specifically prohibit retaliation in any form against an employee who "makes a report of alleged harassment . . . ," noting that such retaliation is a **"serious violation of this policy and is prohibited by law."** (Emphasis added.)

23.    In addition, HSBC Human Resources policies specifically prohibit all forms of sexual harassment:

> The Company is committed to creating and maintaining a collegial work environment in which all individuals are treated with respect and dignity. Everyone has the right to work in a professional atmosphere that promotes equal opportunities and prohibits discriminatory practices, including sexual harassment . . . . Such harassment, whether verbal, physical or in the form of a hostile work environment . . . is unacceptable and will not be tolerated.

(Section 140, Corporate Human Resources Policies).

24.    HSBC's non-harassment policy provides, in pertinent part, as follows:

**POLICY**

**DESCRIPTION OF HARASSMENT**

> Harassment based upon the foregoing characteristics can be either blatant or overt or subtle and covert. Such behavior can demean, abuse, intimidate or offend others because of their personal attributes or background. . . Regardless of whether the acts in question are verbal or non-verbal, typically they are: (1) directed

6

toward an individual or group whom they insult, stereotype, or threaten; (2) designed to create, or have the effect of creating an intimidating or hostile working environment; or (3) disruptive of an individual's ability to pursue normal social or business activities.

## DEFINITION OF SEXUAL HARASSMENT

Sexual harassment constitutes discrimination and is illegal under federal, state, and local laws. For purposes of this policy, sexual harassment is defined as it is in the Equal Employment Opportunity Commission Guidelines . . . as:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or (3) such conduct has the purpose and effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive working environment.

## EXAMPLES OF POTENTIAL SEXUAL HARASSMENT

Sexual harassment may include a range of subtle and not-so-subtle conduct. Depending upon the circumstances, this conduct may be overt pressure for sexual favors; sexual jokes, flirtations, innuendoes, advances, or propositions; verbal abuse of a sexual nature; graphic commentary about an individual's body, sexual prowess or sexual deficiencies; sex-based leering, whistling, touching or pinching; assault or other coerced sexual acts; suggestive, insulting, or obscene comments or gestures . . . Sexual harassment can include harassment between individuals of the same sex.

(Section 140, Corporate Human Resources Policies).

25.     Given the severe and pervasive nature of the sexual harassment Rist's female co-worker Jane Doe suffered, and the severe retaliation against Rist that followed his complaints and his EEOC Charge, it is apparent that New York and federal laws prohibiting retaliation in the workplace were not enforced by HSBC management, and that HSBC Human Resources

Policies prohibiting all forms of retaliation by HSBC employees and supervisors were not promulgated in good faith.

### FACTUAL BACKGROUND

26.     Rist joined HSBC in September 2010 as Senior Vice President and Sales Trader in the bank's Equity Finance Group.  Before joining HSBC, Rist was employed as an Executive Director at Banco Santander in New York City, and had over two decades of Wall Street experience.

27.     After joining HSBC, Rist reported to Warren McCormick, HSBC's Head of Equity Finance (Americas). McCormick told Rist when he joined the bank that he intended to promote him to Managing Director.

28.     During the first year and half of his employment at HSBC, Rist received a ranking of a "2" (on a 1 to 5 scale, with "1" being the highest). HSBC characterizes a ranking of "2" as "exceeds."  During this period, Rist was respected by his peers and by senior management at HSBC—so much so that he was approached by two senior Managing Directors and asked to work for their teams. Each time, McCormick told Rist "I'll let you go [work for them] as soon as I can find a replacement of your caliber."

### HSBC Executives Sexually Harass Rist's Female Co-Worker

29.     In 2012, Jane Doe was a 27-year-old Business Analyst in HSBC's Global Equity Research Department, who was directly supervised by Eileen Hedges.   Doe began her employment at HSBC in 2008 as an Administrative and Research Assistant.

30.     In early 2012, Rist and Doe began dating, and Rist learned from her that she had been the victim of sexual harassment by Hedges, and by senior male HSBC executives whose unlawful behavior Hedges encouraged.

31.     Throughout 2010 and 2011, Hedges revealed to Doe explicit details of her extramarital sexual relationship with HSBC's Chief Financial Officer. Hedges also demanded that Doe prepare expense reports for Hedges that did not accurately report the identity of the HSBC employees she entertained, including expense reports that related to the CFO.

32.     In August 2010, Hedges went on a business trip to Mexico City, a significant HSBC Americas market, in part to visit with the CFO. Doe was assigned by Hedges to coordinate the trip, and then was invited by Hedges to make the trip in order to conduct an HSBC Americas internal training seminar.  During the Mexico City sales trip, Hedges pressured Doe to have sex with the CFO of HSBC Brazil, who was present at the Mexico City meetings. Hedges told Doe that the Brazil CFO thought she was attractive, and would welcome a relationship with her.

33.     In early December 2010, Hedges asked Doe to meet with her privately in a vacant office, and demanded that Doe lie if HSBC Human Resources ever asked Doe about Hedges' relationship with the CFO.  Hedges demanded that Doe falsely report to Human Resources that the attendance of both Hedges and the CFO at the Mexico conference was not coordinated with the CFO, and that it was a coincidence that Hedges and the CFO were in Mexico at the same time.  Hedges made it clear to Doe that if she did not lie to Human Resources and support Hedges' version of events, her employment would suffer.

34.     Ellen Weiss of HSBC Human Resources conducted an HSBC investigation of Hedges' relationship with the CFO.  Weiss was a close friend of Hedges for over a decade. Both Hedges and the CFO falsely denied their affair during the course of the HSBC investigation. HSBC did not question Doe at any time about Hedges' relationship with the CFO.  HSBC closed its investigation without any disciplinary action against either executive.

35.    In late 2010, Hedges and Doe traveled to Brazil on HSBC Americas business. During a business dinner, Hedges made numerous sexually explicit comments in the presence of Doe and male HSBC employees, including repeated and graphic reference to her "three minute" rule with her husband – that if Hedges wanted her husband to do something, she motivated him by giving him fellatio for three minutes.

36.    This sexual harassment continued during a holiday party in December 2010 in New York.  At that time Hedges pulled Doe aside, proceeded to tell Doe that she needed to dump her boyfriend, "dress sexier," and "show more skin" in the workplace.  When Doe objected to this intimidation, Hedges proceeded to pull Doe's blouse down, trying to expose her breasts, until Doe pushed her away.  On another occasion, Hedges pulled down her own dress, and bra, and fully exposed her breasts to Doe and her co-worker, Michael Picarella.

37.    During 2011, and until the time Doe's employment was terminated in 2012, Hedges falsely reported to co-workers that Doe was having sexual relations with HSBC clients. Hedges told Doe's co-workers that every time she traveled with Doe on HSBC business, Doe had sex with bank clients attending the meetings, including at HSBC Americas meetings in Toronto and Mexico City.

### Hedges and Senior Male HSBC Executives Sexually Harass
### Jane Doe at Florida Conference

38.    In late March 2012, Doe was asked to join her supervisor Hedges at HSBC's 2012 LatAm (Latin America) Investment Summit in Key Largo, Florida. The three-day conference, hosted by HSBC, brought CEO and CFO-level executives from HSBC corporate clients in Latin America together with HSBC institutional investor clients.

39.     Rist also attended the Key Largo conference, in view of his Latin America responsibilities, along with senior HSBC executives stationed in Mexico and throughout Latin America.

40.     On the third day of the Key Largo conference, after a dinner and a keynote speaker, there was an HSBC-sponsored party. The Head of Global Markets Sales for HSBC Mexico was present. During that evening, Hedges approached Doe and said that the HSBC Mexico Head wanted to speak with her. Because Doe was told that a senior executive wanted to speak with her, she went over to the HSBC Mexico Head's group and said hello. Hedges followed her, and in the presence of the HSBC Mexico Head and Doe, encouraged the HSBC Mexico Head to have sex with Doe, and encouraged Doe to have sex with him. Doe expressed objection to Hedges' comments and left their presence.

41.     After the HSBC-sponsored party, Hedges asked Doe to drive her, an HSBC salesperson based in Santiago, Chile, and the HSBC Mexico Head to another HSBC function held at a villa rented by HSBC's Head of Equity Research for Brazil.

42.     During the drive to the event, the HSBC Mexico Head sat beside Doe in the passenger seat. Doe was wearing a dress.  During this trip, the HSBC Mexico Head reached under Doe's dress, put his hand on her inner thigh in a sexual manner, and attempted to touch her between her legs.  Doe pushed the HSBC Mexico Head's hand away, and told him not to touch her again.

43.     Later that evening, Hedges again pressured Doe to have sex with the HSBC Mexico Head.  Though Doe objected, and told Hedges to leave her alone, Hedges continued to pressure her. Hedges told Doe that she would not "tell anyone" if Doe had sex with the HSBC Mexico Head.  Doe again told Hedges that her demand for sexual favors for the HSBC Mexico

Head was intimidating and offensive, and to stop it. Nevertheless, in the HSBC Mexico Head's presence, Hedges continued her harassing conduct, stating, "isn't [Doe] beautiful?" and "don't you want to sleep with her," continuing to encourage the HSBC Mexico Head's advances.

44.     Hedges continued to pressure Doe into having sex with the HSBC Mexico Head, saying that "it was okay" and that Hedges "wouldn't say a word." Doe believed that Hedges told the HSBC Mexico Head that Doe liked him, found him attractive, and appreciated his advances.

45.     Shortly thereafter, the HSBC Mexico Head touched Doe again, this time placing his hand on her buttocks, and pinching her. Doe immediately removed his hand, told him to stop touching her, and retreated from his and Hedges' presence, making it clear that his behavior was demeaning and unwelcome.

46.     During the Key Largo conference, Rist personally witnessed an HSBC Managing Director, who was Head of Credit Sales, verbally attack Doe at a table where he and other attendees were sitting. The Managing Director attacked Doe in front of the entire table, stating that he would like "to bend her over, pull her pants down, and spread her checks."

47.     At another time during the Key Largo conference, Rist stood outside of a group involving HSBC senior executives, including the HSBC Mexico Head, Hedges, and Doe. Rist observed the HSBC Mexico Head reach over and grope Doe's buttocks. Doe pushed the HSBC Mexico Head's hand away and recoiled, while Hedges smiled approvingly at the HSBC Mexico Head.

48.     Rist also observed HSBC's Head of Credit Sales talking about playing foosball with Doe, stating that Doe had the correct hand motions on the foosball table that would translate sexually. He then made a lewd gesture simulating a sexual act stating, "you know she's really good at that."

49.     Doe learned that, by spring 2012, Hedges was repeatedly telling her co-workers that she and her direct report, Pablo Pizzimbono, wanted Doe fired. Doe learned that both Hedges and Pizzimbono made that desire known to HSBC management, including Ellen Weiss in Human Resources, in an attempt to prevent Doe from ever reporting the sexual harassment she suffered to HSBC's senior management.

50.     Doe repeatedly complained to Hedges about the unlawful conduct described above, and opposed the sexual harassment she suffered. The result was the termination of her employment by HSBC in May 2012 in retaliation for her opposition to the sexual harassment described herein.

51.     Weiss called Doe to her office on May 31, 2012, and told her that her employment was being terminated effective the next day, alleging that she had violated an HSBC integrity policy by denying a private relationship with Rist a few days earlier.

52.     The true reason Doe's employment was terminated was retaliation for her complaints to Hedges about the sexual harassment she suffered at HSBC, and to prevent Doe from revealing this unlawful conduct to HSBC management.

### Rist Complains To HSBC That Doe Was Sexually Harassed By HSBC Executives

53.     Immediately after Rist learned that HSBC had terminated Doe's employment, he requested a meeting with Ellen Weiss to discuss Doe's termination. The meeting took place on June 1, 2012; Jennifer Whang of HSBC Human Resources also attended the meeting. Rist complained to Weiss that Doe's employment had been unfairly terminated for truthfully answering Weiss's questions regarding her relationship with Rist, and that her termination was intended to cover up the sexual harassment Doe had experienced. Rist said to Weiss that "what you did to [Doe] was wrong . . . especially after everything that Eileen did to her."

54.    Rist also complained to Weiss and Whang that Jane Doe had been sexually harassed by Hedges, and by senior male HSBC Managing Directors, with Hedges' encouragement. He included in this complaint the sexual harassment incidents that occurred at the HSBC LatAm conference in Key Largo in March that are discussed above.

55.    Following this meeting, Whang purported to investigate the sexual harassment complaints that Rist and other HSBC employees, including Michael Picarella, had made about Hedges and senior male HSBC executives. During the investigation, Whang met with Rist, at which time Rist reiterated his earlier complaint that Doe had been sexually harassed by Hedges, HSBC's Head of Credit Sales, and by HSBC's Mexico Head, including at the Key Largo conference.

56.    In June 2012, Rist's supervisors, McCormick and O'Leary, told Rist separately that they were in communication with HSBC Human Resources, and knew "the details of the whole story" of Rist's complaints concerning the sexual harassment of Jane Doe.

57.    In late October 2012, while complaining about the retaliation he was experiencing, Rist reiterated his complaints regarding the sexual harassment of Doe to Mary Bilbrey, the Head of HSBC Human Resources. Bilbrey asked Rist to speak to Maria Malanga, an HSBC Human Resources executive who was not located in New York City, and he did so. Rist reiterated to Malanga his complaint that Jane Doe had been sexually harassed by senior HSBC executives, including at the Key Largo conference, and stated his belief that his complaint about the unlawful treatment Doe had received was the reason for the retaliation he was experiencing.

**HSBC Retaliates Against Rist**

58.    On or about July 15, 2012, McCormick ordered Rist to stop attending the HSBC weekly Sales Manger Meeting that was chaired by Pizzimbono. Prior to July 15, 2012, Rist had

regularly attended these meetings for almost a year. The weekly Sales Manager Meetings were attended by the senior sales leaders of the different divisions of HSBC.

59.     On July 20, 2012, without explanation, McCormick directed Rist to stop attending the International Swap & Derivatives Association ("ISDA") Priority Committee meetings. Rist was replaced by Paul Busby, HSBC's Head of US Prime Sales.

60.     Shortly thereafter, McCormick and Busby instructed Rist to begin "introducing" his client accounts to a junior co-worker, Ted Langworthy ("Langworthy"), who had the same title, role and position as Rist. Langworthy also reported to McCormick. At no point in Rist's career had he ever been directed to invite a co-worker to share responsibilities for a client account involving the same type of financial product.

61.     Thereafter, as directed, Rist introduced numerous client accounts he had personally developed at the bank to Langworthy, who then took over each of these accounts. McCormick and Busby did not instruct Langworthy similarly to introduce any of his client accounts to Rist. Because the quantity and quality of client accounts are directly tied to compensation, Rist was severely damaged by this raid upon his client accounts.

62.     McCormick's and Busby's instructions to Langworthy were designed to – and did – downgrade Rist's standing and career at HSBC with the long term goal of forcing him to leave the bank.

63.     In July 2012, within weeks of his complaints to HSBC HR regarding the sexual harassment of Jane Doe, McCormick downgraded Rist in a midyear review by giving him a rating of four – "inconsistent" – the second lowest rating given by HSBC. During Rist's entire career on Wall Street, he had never received an average ranking or below, let alone anything equivalent to a ranking of "inconsistent" or worse.

64.     Rist's July 2012 mid-year review, which followed his complaints concerning the sexual harassment of Jane Doe, included a dramatically reduced performance ranking over his December 2011 ranking. McCormick rated Rist as a two – "exceeds" – in December 2011. McCormick wrote at that time that Rist "had an outstanding 2011 [and] was successful in raising our profile directly with clients and the internal Sales forces and RM network . . . ." McCormick went on to predict that for 2012, Rist would "find the market landscape generally unchanged." McCormick added that Rist was "well liked and respected by [his] colleagues and peers globally and play[ed] an important role in the overall morale of the desk." He described Rist as a humble person, who tended to "undervalue[] his contribution" to the bank.

65.     McCormick's dramatically different July 2012 comments and ranking were in obvious retaliation for Rist complaining that Doe was the victim of sexual harassment by senior HSBC executives.

66.     On August 29, 2012, shortly after McCormick gave Rist the negative performance ranking, Suzy White, Chief Operating Officer of HSBC Global Markets, approached Tom O'Leary, HSBC's Head of Equities (Americas), and Rist, as they sat in a bar in the Trump Hotel in Toronto, Canada, while attending an HSBC conference.

67.     When White approached and greeted O'Leary, Rist stood up, extended his hand, and said to White, "I am James Rist," to which she responded, "I know you Jamie, I know all about you." White then told Rist that because Doe's employment was terminated under "questionable circumstances" and implicated Rist's relationship with Doe, the bank needed to penalize him. She told Rist that if he remained a "team player," the poor ranking he received during his 2012 mid-year review would improve back to his December 2011 "exceeds" ranking. That improvement did not occur.

68.     White also threatened Rist regarding his complaints that Doe had been sexually harassed. She told Rist that he should not get involved with the HSBC investigation of the sexual harassment complaints against Hedges and other HSBC executives, and should stay out of the investigation. White told Rist "you're out of it, so stay out of it."

69.     During the same conversation, White threatened Rist's career at the bank if he made further complaints about the sexual harassment of Jane Doe. She told him that his future at the bank was contingent upon him being a team player, and complying with her demand. She then asked, "you do want to be a managing director, don't you?"

70.     Beginning in October 2012, the retaliation Rist experienced at the hands of McCormick increased drastically. During this time period, O'Leary directed that Rob Domanko, a Senior Vice President, replace McCormick as Rist's supervisor, although Rist continued to report to McCormick on a daily basis.

71.     As a result of the ongoing retaliation he experienced from McCormick, Busby, and Domanko, Rist scheduled a meeting with Mary Bilbrey to complain about the retaliation he was experiencing, and to seek her advice on how to stop it.  Rist met with Bilbrey on October 15, 2012, and complained to her that he was being retaliated against because he had opposed the sexual harassment of Doe.  Bilbrey instructed Rist to meet with Maria Malanga.

72.     On October 17, 2012, Rist met with Malanga. During the meeting, Rist told Malanga that he was being retaliated against by McCormick. Rist also expressed to Malanga that the ongoing "reassignment" of his client accounts to others, including Busby and Langworthy, was severely damaging his career at HSBC, as well as his compensation.

73.     On October 24, 2012, during the course of a meeting with Domanko, Rist asked Domanko why he had been removed from sales coverage for an account that he had entirely

developed for the bank, and why that account had been assigned to Domanko. Domanko reacted angrily to Rist's questions and began yelling at Rist, accusing him of a "poor attitude." Domanko told Rist that nobody liked him at HSBC, that Rist "do[es]n't get along with his colleagues," and that he was "tired of having to defend Rist" from others.

74.     That same day, Rist met again with Malanga. During the meeting, Rist complained that many of the client accounts he had previously covered were continuing to be reassigned.

75.     The following day, on October 25, 2012, a co-worker informed Rist that Weiss had obtained access to Rist's HSBC email. Weiss had no authority to monitor Rist's email address. Weiss' monitoring of Rist's email was open knowledge at the bank, was defamatory, and was an act of retaliation.

76.     Throughout the second half of 2012, McCormick, Busby and Domanko undermined Rist's performance. They prevented Rist from bringing new clients into the bank, and directed trades for which Rist should have been credited away from him to his peers. For example, on October 30, 2012, a client requested that Rist fund a $50 million transaction. As completion of the task approached, McCormick learned of Rist's client's request and ordered that Rist not complete the transaction. McCormick then directed Rist to have another co-worker complete the transaction, thereby preventing Rist from obtaining credit for the trade. When Rist confronted McCormick about handing off the $50 million transaction to a co-worker, McCormick yelled in Rist's face, "Damn it, Jamie, I'm the only one who's trying to save you. Everybody else is trying to get you fired."

77.     From October 2012 until Rist left HSBC on May 13, 2014, McCormick went out of his way to undermine Rist's reputation among his peers by being verbally abusive, and

defaming Rist in front of his co-workers. Examples include yelling at Rist for not sitting properly in his chair, making false accusation regarding Rist's professional conduct, attacking Rist's work ethic, telling Rist's coworkers that he was a "bad influence," and telling his co-workers that Rist and a colleague were homosexuals.

78.     During this same time period, Domanko retaliated against Rist by excluding him from business meetings and decision-making, and otherwise treated Rist in a hostile manner. Until Rist left HSBC, Domanko constantly interfered with Rist's client relationships. For example, beginning in October 2012, Domanko visited many of Rist's clients at their respective places of business without Rist, and substituted himself as the primary contact between the bank and Rist's former clients. Domanko also directed that Langworthy visit Rist's client accounts without Rist.

79.     Because of the negative way in which Domanko, Busby and McCormick treated Rist, Rist's peers began treating Rist in a disrespectful manner, ignoring him in the hallway, and not responding to his emails or simple requests.

80.     In or around February 2013, Rist's relationship with Busby further deteriorated when Busby criticized him in front of his peers. Busby told Rist's peers to stay away from him because he was a "bad influence."

81.     On February 14, 2013, Rist wrote Tom O'Leary in an effort to improve his relationship with Busby. In the email, Rist stated in relevant part that:

> I'm concerned due to the lack of communication between myself and Paul Busby. Although I have approached him several times to include me in his pitches and introductions – he will only interact with my colleague, Ted. . . . I even offered to change my name to Ted so that Paul would acknowledge me. . . . Because I have only been allocated few accts that don't trade actively – I am concerned that I won't be able to reach my gnbv targets.

82.     On February 27, 2013, Rist received his end-of-year bonus for the 2012 fiscal year. His bonus was $125,000, cut nearly sixty-percent (60%) from the 2011 fiscal year bonus of $400,000. This drastic cut in Rist's compensation followed his 2012 complaints concerning the sexual harassment Doe suffered.

83.     Although numerous new accounts had been steadily coming into the bank since August 2012, Rist was assigned only three of them – all were inactive and stale when assigned, and had no trades associated with them. All the other new accounts, many of high quality, were assigned to Rist's co-worker Langworthy, despite his lack of experience.

84.     During 2013, Rist continued to complain about the retaliation that he experienced daily at HSBC. Rist complained to HR and his supervisors on numerous occasions, including but not limited to, on February 14, 2013, April 3, 2013, April 4, 2013, April 5, 2013, April 15, 2013, May 16, 2013.

85.     On April 5, 2013, Rist complained to HSBC HR that HSBC was not restraining the retaliation that he was suffering.  In an email to Mary Bilbrey, Rist stated that:

> I've lost confidence in the HR staff based on the results of my previous experience. Last visit I highlighted a few issues which I felt were forms of retaliation – no viable solution of my issues were addressed – but some of the information I provided regarding the GM COO and America's Equity Head conversations were used to my detriment. . . . So here we are 6 months after I approached you – I've clearly been retaliated against through a reduction in roles/tasks/compensation – and now I'm the target of constant verbal bullying (that my colleagues will gladly confirm) and public embarrassment . . . .

86.     On May 16, 2013, Rist met with Ann McQuinny of HSBC Human Resources. During that meeting Rist complained to her that he continued to receive verbal abuse from McCormick and Domanko, and that this abuse was witnessed by numerous co-workers.

87.     In May 2013, Rist filed a formal grievance against McCormick after McCormick instructed Rist that he was forbidden to enter execution orders. In Rist's entire career, he had never heard of a sales trader being told they could not enter their own orders. McCormick's instruction prevented Rist from generating revenue for the bank and had a major negative impact on his earnings.

88.     In or around mid-July 2013, HSBC hired Gabriel Comoti Santos. Mr. Santos assumed the majority, if not all, of Rist's responsibilities, and effectively became Rist's replacement. All new client accounts were directed to Santos instead of Rist. Although Mr. Santos was based in Brazil, he assumed primary coverage of all new Latin American business, and worked regularly out of the HSBC New York office. At the same time, Domanko and Busby continued to reassign accounts from Rist to his colleagues, including Kevin Nowlin, a new hire at HSBC.

89.     The retaliation Rist suffered effectively destroyed his career prospects at HSBC, undermining his professional standing among his colleagues.  In July 2013, an HSBC colleague asked Rist, in a sarcastic manner, referring to an ongoing transaction, "are you still going to be here at closing?"—an event which was only days away. Other colleagues openly referred to Rist as the "Teflon Don," telling Rist that, "nothing sticks to you – they are trying to fire you but you are still here."

**The Unlawful Retaliation Against Rist Continues
After He Files A Charge of Discrimination With The EEOC**

90.     Rist filed an EEOC Charge of Discrimination against HSBC on August 8, 2013, based upon HSBC's persistent and systematic retaliation against him for complaining that senior HSBC executives had sexually harassed Jane Doe.

91.    HSBC's retaliation against Rist continued in the months that followed the filing of

his EEOC Charge.  This retaliation included the following conduct:

    a.  McCormick told Rist's colleagues, and other senior managers, that, "Jamie is a bad guy" and a "bad influence" and that they "should stay away from him." Numerous colleagues related this remark to Rist.

    b.  The bank forced Rist to report to Domanko, who was a junior employee. Domanko refused to meet with Rist despite numerous requests by Rist to do so. Thereafter, Busby, Domanko's supervisor, engaged in similar behavior.  Throughout this time, Rist complained to O'Leary and HR about the refusal of his supervisors to speak with him and their exclusion of him from meetings that were necessary for Rist to perform his job.

    c.  After Rist received his mid-year performance evaluations in August 2013, Rist confronted Domanko and asked how he could evaluate him if he never interacts with him.  Domanko sarcastically replied that he had enough substance to draft his evaluation because "I overhear your phone calls."

    d.  Busby and Domanko assigned Rist numerous administrative tasks normally assigned to junior employees.  For example, Busby directed Rist to create generic marketing materials even though the bank has a group specifically designed for this task.

92.    In March 2014, HSBC again dramatically cut Rist's bonus compensation.  His

bonus for 2013 was cut more than 40%, this time from $125,000 down to $73,000. <u>By March

2014, Rist's bonus compensation had been cut by 82% from its level before he made his first

complaint regarding the sexual harassment of Jane Doe two years earlier.</u>

93.    HSBC's retaliatory conduct against Rist as described above, which combined to

make him feel unwanted and unwelcome, continued unabated through May, 2014, until Rist was

compelled to resign his employment effective May 14, 2014, in an effort to limit the damage to

his career.  In his resignation letter to Mary Bilbrey, dated May 13, 2014, citing a 60% cut in his

compensation, the reassignment of important client accounts, his exclusion from important

company activities, and disparagement before his peers, Rist reported working conditions "so

oppressive and offensive that" he had been involuntarily terminated by the bank, and was compelled to resign his employment.

## FIRST CLAIM FOR RELIEF
### Retaliation
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.)

94.     Plaintiff repeats and realleges the allegations of Paragraphs 1–93 above as if separately set forth herein.

95.     At all relevant times, Plaintiff was an "employee" of the Defendant under the provisions of Title VII, 42 U.S.C. § 2000e(f), and Defendant was an "employer" under the provisions of Title VII, 42 U.S.C. § 2000e(b).

96.     From on or around June 2012, through the present, Plaintiff opposed Defendant's unlawful and discriminatory employment practices described above, including the sexual harassment suffered by his female co-worker, Jane Doe, and HSBC's retaliation against Plaintiff.

97.     This opposition included written and oral internal complaints of discrimination to the Defendant, its Human Resources Department, and Plaintiff's superiors, including Hedges, White, Weiss, Domanko, and McCormick, and the filing by Plaintiff of a Charge of Discrimination against HSBC (asserting unlawful retaliation) with the Equal Employment Opportunity Commission on August 8, 2013.

98.     This opposition by Plaintiff to Defendant's unlawful employment practices constitutes protected activity under Title VII, 42 U.S.C. § 2000e-3(a), and was well known to the Defendant and each executive identified herein at or about the time such opposition was made.

99.     Defendant responded to Plaintiff's complaints regarding the sexual harassment of his female co-worker by retaliating against him for having engaged in such protected activity, in violation of Title VII, 42 U.S.C. § 2000e-3(a).

100.    Such retaliation consisted of the materially adverse employment actions taken against Rist by HSBC and its executives that are described herein.

101.    As a result of Defendant's retaliatory conduct, Plaintiff has suffered substantial damages, including the loss of back pay and front pay, and is entitled compensatory damages, including emotional pain and mental anguish, and reputational damage, including loss of earning capacity, in an amount to be determined at trial.

102.    Defendant's unlawful retaliatory conduct, as described herein, was undertaken with malice or reckless indifference to Plaintiff's rights, entitling him to punitive damages under Title VII.

## SECOND CLAIM FOR RELIEF
### Retaliation
### (NYCHRL §§ 8-107(7) & (19))

103.    Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1–93 above as if separately set forth herein.

104.    From in or around April 2012 through the present, Plaintiff opposed the Defendant's sexual harassment of his female co-worker by engaging in the protected activity identified in the preceding paragraphs.

105.    Defendant responded to Plaintiff's complaints of the sexual harassment of his female co-worker, and to his complaints of unlawful retaliation, by retaliating against him for having engaged in such protected activity, in violation of § 8-107(7) and § 8-107(19) of the New York City Human Rights Law.

106.    Such retaliation consisted of the adverse employment actions taken against Rist by HSBC and its executives that are described throughout the preceding paragraphs.

107.    As a result of Defendant's retaliatory conduct, Plaintiff has suffered substantial damages, including the loss of back pay and front pay, and is entitled to compensatory damages,

including emotional pain and mental anguish, and reputational damage, including loss of earning capacity, in an amount to be determined at trial.

108.   Defendant's unlawful retaliatory conduct, as described herein, was undertaken with malice or reckless indifference to Plaintiff's rights, entitling him to punitive damages.

### THIRD CLAIM FOR RELIEF
**Retaliation**
**(NYSHRL, New York Executive Law § 296 *et seq.*)**

109.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1–93 above as if separately set forth herein.

110.   From in or around April 2012 through the present, Plaintiff opposed the Defendant's sexual harassment of his female co-worker by engaging in the protected activity identified in the preceding paragraphs.

111.   Defendant responded to Plaintiff's complaints of gender discrimination and sexual harassment of his female co-worker, and to his complaints of unlawful retaliation, by retaliating against him for having engaged in such protected activity in violation of § 296 of the New York State Human Rights Law.

112.   Such retaliation consisted of the materially adverse employment actions taken against Rist by HSBC and its executives that are described throughout the preceding paragraphs.

113.   As a result of Defendant's retaliatory conduct, Plaintiff has suffered substantial damages, including the loss of back pay and front pay, and is entitled to compensatory damages, including emotional pain and mental anguish, and reputational damage, including loss of earning capacity, in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendant for all damages permitted by law, including back pay, front pay, and compensatory and punitive damages, and

for prejudgment interest, attorneys' fees and costs, and for such other and further relief as determined to be just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.


Dated: New York, New York
        August 14, 2014

                                        Respectfully submitted,

                                        LIDDLE & ROBINSON, L.L.P.
                                            James R. Hubbard
                                            Michael E. Grenert

                                        800 Third Avenue
                                        New York, New York  10022
                                        (212) 687-8500
                                        jhubard@liddlerobinson.com
                                        mgrenert@liddlerobinson.com


                                        By:

                                        Attorneys for Plaintiff James Rist