UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES RIST,<br><br>                          Plaintiff,<br><br>             -against-<br><br>HSBC SECURITIES (USA) INC.,<br><br>                          Defendant. | 14-cv-6503 (ALC) (AJP) |

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Damien J. Marshall
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Phone: (212) 446-2300
Facsimile: (212) 446-2350
dmarshall@bsfllp.com

Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, District of Columbia 20036
Phone: (202) 955-8206
Facsimile: (202) 530-9606
escalia@gibsondunn.com

*Attorneys for HSBC Securities (USA) Inc.*

**Table of Contents**

Preliminary Statement ................................................................................................ 1

Statement of Facts ..................................................................................................... 2

    A.  Rist Performed Well In His Initial Role of Sales Origination ........................... 2

    B.  In 2012, Rist's Personal Life Began to Interfere With His Work ..................... 3

    C.  Rist's Role Changed in 2012 ........................................................................ 4

    D.  Rist Failed In His New Role of Revenue Generation ..................................... 6

    E.  In 2014, Rist Voluntarily Resigned from HSBC ........................................... 11

    F.  Rist's Allegations of Retaliation Are Unsupported ....................................... 12

Legal Standard ......................................................................................................... 13

Argument ................................................................................................................. 15

    I.  Rist Cannot Establish a *Prime Facie* Case Because He Cannot Show Causation ........... 16

    II.  Rist Cannot Establish a *Prima Facie* Case of Constructive Discharge ......................... 20

    III.  HSBC Had Legitimate, Non-Discriminatory Reasons For Its Actions .......................... 22

    IV.  Rist's NYCHRL Claim Fails ........................................................................ 24

Conclusion ............................................................................................................... 25

## Table of Authorities

**Cases**

*Ahmed v. Heartland Brewery L.L.C.,*
  No. 05-cv-2652, 2007 WL 2125651 (S.D.N.Y. July 25, 2007) ............................................... 17

*Bowen-Hooks v. City of New York,*
  13 F. Supp. 3d 179 (E.D.N.Y. 2014) ....................................................................................... 15

*Brady v. Wal-Mart Stores, Inc.,*
  No. 03-cv-3843, 2005 WL 1521407 (E.D.N.Y. June 21, 2005) .............................................. 21

*Brightman v. Prison Health Serv., Inc.,*
  108 A.D.3d 739 (2d Dep't 2013) .............................................................................................. 25

*Bryant v. Merrill Lynch, Pierce, Fenner & Smith,*
  No. 12-cv-2940, 2013 WL 2359109 (S.D.N.Y. May 30, 2013) ............................................... 25

*Burlington N. & Santa Fe Ry. Co. v. White,*
  548 U.S. 53 (2006) ................................................................................................................... 15

*Bussa v. Alitalia Linee Aeree Italiane, S.p.A.,*
  No. 02-cv-10296, 2004 WL 1637014 (S.D.N.Y. July 21, 2004) ............................................. 23

*Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.,*
  No. 00-cv-6307, 2007 WL 259937 (S.D.N.Y. Jan. 29, 2007) ................................................. 20

*Campbell v. Alliance Nat'l Inc.,*
  107 F. Supp. 2d 234 (S.D.N.Y. 2000) ...................................................................................... 18

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................................................. 14

*Clark Cty. Sch. Dist. v. Breeden,*
  532 U.S. 268 (2001) ................................................................................................................. 18

*Clark v. Gotham Lasik,*
  No. 11-cv-1307, 2013 WL 4437220 (S.D.N.Y. Aug. 20, 2013) ............................................. 21

*Cortez v. Connecticut Department of Transportation,*
  606 F. Supp. 2d 246 (D. Conn. 2009) ...................................................................................... 21

*Cotterell v. Gilmore,*
  No. 12-cv-3808, --- F. Supp. 3d ---, 2014 WL 6886079 (E.D.N.Y. Dec. 8, 2014) ................. 16

*Davis v. Avaya, Inc.,*
  295 F. App'x 380 (2d Cir. 2008) .............................................................................................. 22

*Duviella v. JetBlue Airways,*
   353 F. App'x 476 (2d Cir. 2009) ................................................................ 16

*Fincher v. Depository Trust & Clearing Corp.,*
   604 F.3d 712 (2d Cir. 2010) .................................................................... 20

*Flaherty v. Metromail Corp.,*
   No. 98-cv-8611, 2001 WL 868011 (S.D.N.Y. July 31, 2001).................................. 20

*Galimore v. City Univ. of N.Y. Bronx Comm'y Coll.,*
   641 F. Supp. 2d 269 (S.D.N.Y. 2009) ........................................................ 18

*Garrett v. Garden City Hotel, Inc.,*
   No. 05-cv-962, 2007 WL 1174891 (E.D.N.Y. Apr. 19, 2007).................................. 18

*Greene v. Brentwood Union Free Sch. Dist.,*
   966 F. Supp. 2d 131 (E.D.N.Y. 2013) ........................................................ 17

*Guzman v. City of New York,*
   No. 13-cv-5445, --- F. Supp. 3d ---, 2015 WL 1239988 (S.D.N.Y. Mar. 18, 2015) ............... 25

*Henry v. Wyeth Pharm., Inc.,*
   616 F.3d 134 (2d Cir. 2010) .................................................................... 17

*John v. Dep't of Info. Tech. & Telecomm'ns,*
   No. 06-cv-13119, 2008 WL 4694596 (S.D.N.Y. Oct. 23, 2008).................................. 23

*Johnson v. IAC/Interactive Corp.,*
   2 F. Supp. 3d 504 (S.D.N.Y. 2014) ...................................................... 22, 25

*Joseph v. Leavitt,*
   465 F.3d 87 (2d Cir. 2006) .................................................................... 15

*Lambert v. McCann Erickson,*
   543 F. Supp. 2d 265 (S.D.N.Y. 2008) ........................................................ 16

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973)............................................................................ 14

*McWhite v. N.Y.C. Housing Auth.,*
   No. 05-cv-991, 2008 WL 1699446 (E.D.N.Y. Apr. 10, 2008).................................. 15

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,*
   715 F.3d 102 (2d Cir. 2013) .................................................................... 15

*Pibouin v. CA, Inc.,*
   867 F. Supp. 2d 315 (E.D.N.Y. 2012) ........................................................ 23

iii

*Quarless v. Brooklyn Botanic Garden Corp.,*
    No. 14-cv-2590, --- F. App'x ---, 2015 WL 2146248 (2d Cir. May 8, 2015) ........................ 24

*Raskin v. Wyatt Co.,*
    125 F.3d 55 (2d Cir. 1997) ................................................................................................ 17

*Risco v. McHugh,*
    868 F. Supp. 2d 75 (S.D.N.Y. 2012) ................................................................................. 19

*Rite Aid of N.Y., Inc. v. N.Y.S. Div. of Human Rights,*
    875 N.Y.S.2d 708 (4th Dep't 2009) ................................................................................... 22

*Rotert v. Jefferson Fed. Sav. & Loan Ass'n,*
    623 F. Supp. 1114 (D. Conn. 1985) ................................................................................... 22

*Rozenfeld v. MTA Bus Co.,*
    No. 13-cv-4847, 2015 WL 1174768 (S.D.N.Y. Mar. 16, 2015) ........................................ 14

*Russo v. N.Y. Presbyterian Hosp.,*
    972 F. Supp. 2d 429 (E.D.N.Y. 2013) ............................................................................... 25

*Sanzo v. Uniondale Union Free Sch. Dist.,*
    381 F. Supp. 2d 113 (E.D.N.Y. 2005) ............................................................................... 22

*Shapiro v. N.Y.C Dep't of Educ.,*
    561 F. Supp. 2d 413 (S.D.N.Y. 2008) ............................................................................... 20

*Shih v. JPMorgan Chase Bank, N.A.,*
    No. 10-cv-9020, 2013 WL 842716 (S.D.N.Y. Mar. 7, 2013) ............................................ 25

*Sloan v. United Techs. Corp.,*
    596 F. App'x 35 (2d Cir. 2015) ......................................................................................... 18

*Smith v. Dep't of Correction,*
    No. 07-cv-1862, 2009 WL 2487981 (D. Conn. May 12, 2009) ........................................ 18

*St. Mary's Honor Ctr. v. Hicks,*
    509 U.S. 502 (1993) ........................................................................................................... 14

*Tse v. UBS Fin. Servs., Inc.,*
    568 F. Supp. 2d 274 (S.D.N.Y. 2008) ............................................................................... 21

*Univ. of Texas Sw. Med. Ctr. v. Nassar,*
    133 S. Ct. 2517 (2013) ....................................................................................................... 16

*Virgona v. Tufenkian Import-Export Ventures, Inc.,*
    No. 05-cv-10856, 2008 WL 4356219 (S.D.N.Y. Sept. 23, 2008) ..................................... 19

iv

*Watson v. Paulson*,
    578 F. Supp. 2d 554 (S.D.N.Y. 2008) ............................................................ 22

*Weinstock v. Col. Univ.*,
    224 F.3d 33 (2d Cir. 2000) .................................................................. 13, 14

*Wilcox v. Cornell Univ.*,
    986 F. Supp. 2d 281 (S.D.N.Y. 2013) ............................................................ 25

*Williams v. N.Y.C. Housing Auth.*,
    61 A.D.3d 62 (1st Dep't 2009) ......................................................... 15, 16, 24

*Woodman v. WWOR-TV, Inc.*,
    411 F.3d 69 (2d Cir. 2005) .......................................................... 13, 14, 16

**Statutes**

42 U.S.C. § 2000e-5 ..................................................................................... 12

**Rules**

Fed. R. Civ. P. 56 ..................................................................................... 13

Plaintiff James Rist alleges retaliation claims under Title VII (Count 1), the New York City Human Rights Law ("NYCHRL"; Count 2), and the New York State Human Rights Law ("NYSHRL"; Count 3) against Defendant HSBC Securities (USA) Inc. ("HSBC").  HSBC respectfully submits that summary judgment should be granted on all claims.

## Preliminary Statement

In this case, Rist attempts to leverage the sexual harassment allegedly suffered by his paramour ███████████ into a claim for himself, but fails for want of evidence.  Simply stated, there is no evidence that any decisionmaker knew of—much less was motivated by—any complaint Rist allegedly made regarding the harassment of ██████  Accordingly, Rist cannot show causation, and judgment should be entered for HSBC for failure to establish a *prima facie* case.

Of course, there is also no written or contemporaneous evidence that Rist ever complained of █████ sexual harassment.  The people he supposedly complained to have testified that the complaints were never made.  And Rist was neither fired, nor demoted, nor subject to any changes in employment that did not occur to all similarly situated employees as part of a reorganization and expansion of the business.  Thus, there were no protected activities or adverse employment actions.  But even if Rist is permitted to dispute this evidence on the basis of his self-serving statements, the consistent testimony of every HSBC employee he came into contact with, and the total lack of evidence of retaliation against Rist, informs the causation analysis, further warranting summary judgment.

Moreover, Rist's job responsibilities significantly changed in 2012 and he went from being good at his old responsibilities to being bad at his new ones.  At the same time, Rist's extra-marital affairs disrupted his personal life and interfered with his job performance, leading to a written warning, missed business trips, late arrivals to work, and a general degrading of his

1

performance.  Also around the same time, Rist's department was reorganized, and Rist found himself reporting to someone Rist considered to be his junior (despite superior qualifications). Rist responded poorly to these events and became unprofessional—missing meetings, being late, and taking excessive days off, criticizing HSBC to clients, refusing to complete assigned projects or trainings, and spending excessive amounts of time socializing rather than working.  Combined with his failure to meet his performance benchmarks, these actions led to Rist receiving poor reviews and to lower discretionary bonuses than he had previously received.  In 2014, Rist quit voluntarily the day after receiving a job offer from another bank that provided him with a better title and a comparable salary.

Summary judgment is appropriate.  Rist's inability to demonstrate causation prevents him from establishing a *prima facie* case of retaliation.  Even if he could, HSBC's legitimate, non-discriminatory reasons of reorganization, business judgment, and Rist's poor performance cannot be labelled pretextual.  Finally, Rist voluntarily left his job, has no cognizable claim for constructive discharge, and has suffered no damages.  The case must be dismissed.

### Statement of Facts[1]

**A.    Rist Performed Well In His Initial Role of Sales Origination**

Rist was hired by HSBC in 2010 as a Senior Vice President in the Equity Finance group to focus on Latin America.  (Def.'s R. 56.1 Statement of Material Facts ("Facts") ¶¶ 2, 32, 39.) In 2010, his salary was ███████ per annum, he focused on "developing [the] Lat Am franchise" for the "Equity Finance & Delta One team" and, in his end-year review, was rated as a "3" by his manager, Warren McCormick, the Head of Equity Finance (Americas).[2]  (Facts ¶¶ 12-13, 33, 39,

---

[1] Although largely chronological, the facts below are organized according to topic.  A more strictly chronological statement of facts is contained in HSBC's 56.1 Statement of Material Facts filed concurrently.

[2] The top 20% of HSBC employees receive either a 1 or 2; 70% receive a 3; and the bottom 10% receive a 4 or 5. (Facts ¶ 39.)

42.)  For 2011, the salary associated with Rist's position was increased to ▇▇▇▇ due to a compensation policy change within HSBC Global Markets.  (Facts ¶¶ 43-44.)  In both his mid-year and end-year reviews, McCormick rated him a "2," and he received a discretionary bonus of ▇▇▇▇▇ (Facts ¶¶ 45-52.)  Discretionary bonuses are based, in part, on performance. (Facts ¶ 37.)

Both Rist's 2011 reviews noted that Rist's responsibilities would shift in 2012 from a sales origination role to a revenue generation role.  (Facts ¶¶ 46, 50.)  Rist's mid-year review stated that as HSBC's "Lat Am cash capacity solutions come on-line," Rist "should look to refocus his efforts on his core responsibility of building out our Lat Am franchise and profitability."  (Facts ¶ 46.)  Rist's year-end review was even more specific, stating that "neither James or the group as a whole were able to monetize" the business, which would "be a focus for the group in 2012" at which time the group would also be expanded, allowing Rist "to refocus his efforts on a revenue generation rather than an origination sales role."  (Facts ¶ 50.)

**B.     In 2012, Rist's Personal Life Began to Interfere With His Work**

On or around April 18, 2012, Rist's wife, Pamela Rist, came to the HSBC trading floor. (Facts ¶ 55.)  Ms. Rist approached ▇▇▇▇ and accused her of having an affair with Rist.  (Facts ¶ 55.)  As a result, Rist received a written warning from HSBC concluding that "this incident showed a lack of professional judgment."  (Facts ¶¶ 56-57.)  In his written response, Rist failed to take responsibility:  "I did not sign my wife in—nor did I have any idea she was coming to the office.  I did not know she would be invited onto the floor or sit at my desk."  (Facts ¶ 58.)  Rist was having an affair with ▇▇▇▇ (Facts ¶ 59.)  Indeed, Rist was also having an affair with at least one other HSBC employee in 2012.  (Facts ¶ 60.)[3]  During an investigation into the

---

[3] Rist sat for his deposition on May 12, 2015.  (Marshall Decl. Ex. ("Ex.") 80 at 1.)  At that deposition, Rist confirmed the affairs with ▇▇▇▇ and others, which are also documented as outlined at Facts ¶¶ 59-60.  Three days

April 18 incident, ███ twice lied about the affair.  (Facts ¶ 64.)  This breached HSBC's policy, which provided that termination was an appropriate consequence for failure to tell the truth and cooperate with investigations.  (Facts ¶ 65.)  ███ was terminated from HSBC on May 31, 2012.  (Facts ¶ 66.)

Ms. Rist began divorce proceedings in June 2012.  (Facts ¶ 83.)  It was a contentious divorce that involved a child custody dispute.  (Facts ¶ 84.)

Unrelated to these events, HSBC conducted a separate investigation into allegations of misconduct by ███ supervisor, Eileen Hedges.  (Facts ¶¶ 27, 85.)  As a result of that investigation, Hedges was removed from her management role, her compensation was impacted, she received a final written warning, and was required to attend one-on-one trainings with outside counsel.  (Facts ¶¶ 86-89.)  Neither ███ nor Hedges were in Rist's group or reported to his managers.  (Facts ¶¶ 29, 31.)

## C.      Rist's Role Changed in 2012

In mid-2012, after the events described above, Rist's group was reorganized and expanded as HSBC invested more heavily in its customer-focused Equity and Prime Finance businesses.  (Facts ¶ 90.)  As part of this effort, the Equity Finance/Delta 1 and Equity Derivatives groups reorganized to better align with the business structure used in Hong Kong and London.  (Facts ¶ 91.)  The reorganization also sought to formalize a split between salespeople and traders such that salespeople would report directly to a sales manager and traders would report to a trading manager.  (Facts ¶ 92.)  Rist fell on the salesperson side of the line.  (Facts ¶ 93.)

HSBC also hired additional salespeople and managers as part of the expansion.  Ted

---

later, Rist responded to HSBC's requests for admissions and denied having the very same affairs.  (Ex. 72 at Requests 26, 28, 30.)  Not knowing what to make of this inconsistency, HSBC has here presented the facts as illustrated by the documents and Rist's testimony.

Langworthy was hired as a Senior Vice President and became Rist's peer as the only other salesperson on the Equity Finance/Delta 1 desk.  (Facts ¶¶ 19, 94, 100.)  Shortly thereafter, in July 2012, Paul Busby was hired as Managing Director and Head of Prime Service Sales.  (Facts ¶¶ 5, 95.)  Although neither reported directly to him, Busby had functional supervisory authority over both Rist and Langworthy.  (Facts ¶ 6.)  Busby's role, which was newly created, was to spearhead the expansion and growth of the Equity Finance and Prime Finance teams by leveraging his experience from 18 years in those businesses and as Managing Director and Co-Head of Equity Finance at Deutsche Bank, where he supervised a team of over 25 people. (Facts ¶¶ 96-98.)  Langworthy was also from Deutsche Bank and had previously worked with Busby.  (Facts ¶ 99.)

In addition, the salespeople in the Equity Finance/Delta 1 and Equity Derivatives groups were consolidated into a single reporting line reporting to Robert Domanko, Head of Institutional Equity Derivatives & Finance Sales (Americas).  (Facts ¶¶ 15-16, 93.)  One of the reasons Domanko, who had no prior involvement with either of Rist's or ████ groups, was chosen for this role was that he possessed a Series 9/10 License, which requires "knowledge of securities industry rules and certain statutory provisions applicable to the supervision of sales activities at a general securities-oriented branch office."  (Facts ¶¶ 14-16, 129-30.)  HSBC thought it prudent to have a supervisor with a Series 9/10 License in light of then-pending regulations related to the implementation of the Dodd-Frank Act.  (Facts ¶ 132.)  Rist did not have a Series 9/10 License. (Facts ¶ 131.)

The reorganization impacted numerous other individuals in addition to Rist.  For example, Langworthy was also assigned to report to Domanko and McCormick's reporting line was changed such that he would now report to someone who had previously been a peer.

5

(Facts ¶¶ 93, 128.)

Rist's most senior managers—Busby and Tom O'Leary, the Head of Equities
(Americas)—both noted that Rist appeared dissatisfied with the reorganization and expansion.
(Facts ¶¶ 10-11, 109.)  This dissatisfaction manifested itself in numerous ways and affected
Rist's work.

The decisionmakers for this reorganization knew nothing of any complaints Rist alleges
he made during this period.  Patrick George, HSBC's Global Head of Equities, and O'Leary
were involved in the reorganization and expansion, and Busby and Domanko were the on-the-
ground managers who were implementing new policies.  (Facts ¶¶ 5-9, 16, 90.)  All have
testified as to their ignorance of Rist's alleged complaints, and there is no evidence to the
contrary.  (Facts ¶¶ 250, 252, 254-55.)  Indeed, Busby and Domanko were new to the group and
had no prior involvement with either Rist or ████ and George was based in London and had
approximately 700 employees reporting to him from the Americas, Asia, Europe, and the Middle
East.  (Facts ¶¶ 5-9, 14-16.)

**D.      Rist Failed In His New Role of Revenue Generation**

In addition to the organizational changes occurring in 2012, 2012 was also the first year
for which Rist had a revenue generation target, known as "GNBV" (Gross New Business Value).
(Facts ¶ 53.)  GNBV is calculated according to a policy that did not change during the relevant
period (2012 through 2014).  (Facts ¶¶ 233-34.)  The policy applied to all salespeople on the
desk on which Rist worked.  (Facts ¶ 235.)  The expectation that Rist would refocus on revenue
generation was communicated to Rist.  (Facts ¶¶ 46, 50.)

The Latin America business that Rist helped originate in 2010 and 2011 did not perform
as anticipated in 2012.  (Facts ¶ 143.)  As a result of the underperformance of the desk, George
instructed McCormick to review his direct reports to a higher standard in the mid-year 2012

reviews.  (Facts ¶ 137.)  O'Leary also told McCormick that he believed that Rist should be rated a 4.  (Facts ¶ 138.)  Rist's mid-year assessment was completed on or around August 30, 2012, and McCormick noted Rist's "inconsistent start to the year in challenging personal circumstances," and also that "Lat Am revenues have been disappointing to all."  (Facts ¶¶ 139-141, 143, 145.)  Rist received a rating of "4 - Inconsistent."  (Facts ¶ 140.)  McCormick rated one other employee a "4" in mid-2012.  (Facts ¶ 148.)  That employee was fired before the year was out.  (Facts ¶ 149.)

As Rist's performance flagged, he started to behave unprofessionally.  As a consequence of his personal life, Rist missed a business trip to Latin America and at least one additional business trip to Canada.  (Facts ¶¶ 115-16.)  Rist also failed to attend a client meeting in Montreal—without explanation—after having confirmed to his managers that he would be there. (Facts ¶ 151.)  It became "a common occurrence" for Rist to arrive late to work (Facts ¶ 136), which was problematic not only because it was unprofessional, but also because Domanko held 7:45 a.m. meetings with his team at least weekly (Facts ¶ 135).  Towards the end of 2012, Rist had to be prompted by a client after he failed to respond to a series of e-mails, without which response a transaction could not be completed.  (Facts ¶ 164.)  By early 2013, Rist was criticizing HSBC's decisions or process in conversations with clients.  (Facts ¶ 171.)

Within 3-6 months of coming to HSBC in July 2012, Busby had formed the view that Rist did not perform as expected of a Senior Vice President.  (Facts ¶¶ 5, 152.)  Busby found that Rist displayed poor attention to detail, missed deadlines, failed to take initiative, provided excuses rather than solutions, had to be reminded to complete tasks, arrived at meetings unprepared, and was unprofessional in front of clients, showing up late, unshaven, and inappropriately dressed.  (Facts ¶ 153.)  Busby also found Rist unwilling to engage with him on

moving the business forward.  (Facts ¶ 154.)

Rist discussed his year-end 2012 review with McCormick on or around February 26,

2013.  (Facts ¶¶ 172, 175.)  His performance review stated:

> 2012 was a mixed year for James.  James has at time struggled to adapt to the
> change of structure and management within Sales implemented mid 2012 and to
> the increased focus on pure Sales rather than the traditional EF model of Sales /
> Trading.  Additionally, James has found that HSBC has not been in a position to
> onboard many of his historic customers . . . .  This has at times led him to be less
> involved with the growth of Prime in the Americas than I believe he would have
> wished. . . .
>
> As James was aware, from senior management down, 2012 was seen as the year
> when the focus was predominantly on the monetization of Equities product
> globally.  Unfortunately from a local standpoint we again failed to monetize either
> the Lat Am product or the EF client franchise in general in the Americas.  Whilst
> his net gnbv showed behind plan overall, the majority of this gnbv was from
> market counterparts where James provides an important administrative function
> but is not the primary Sales coverage on the account; net of this revenue the
> overall contribution was very disappointing at USD ███ vs a f/y target of USD
> ███
>
> From an individual perspective James should specifically focus on some areas of
> weakness identified in 2012.  Primary areas of focus are on improving the quality
> of his order booking, understanding and control of gnbv, and also the clarity of his
> written communication which can appear vague and / or flippant.  There have
> been instances where James has relayed inaccurate or incomplete information to
> management regarding customer discussions; this has led to confusion internally
> and raised concern within Global Prime management.
>
> Whilst James's year end rating is a 3 overall we would regard this as a weak 3.

(Facts ¶¶ 173-74.)  Rist was nonetheless awarded a discretionary bonus of ███ for 2012.

(Facts ¶ 177.)

Rist's performance did not improve in 2013 and, instead, he continued his unprofessional

behavior.  In March, he was told that he was spending too much time away from his desk and

that he needed to set up road shows.  (Facts ¶ 182.)  Also in March, Busby memorialized a

meeting in which he asked Rist to limit negativity and move forward, and that Rist needed to be

more proactive.  (Facts ¶ 183.)

In April, Rist again criticized HSBC to a client. (Facts ¶ 184.) Busby also noted that Rist had "again" come to a meeting unprepared after telling Busby he was ready. (Facts ¶ 185.)

In May, Domanko told Rist that he was taking too many personal days, not providing sufficient notice of his time off, and causing client meetings to be missed. (Facts ¶ 186.)

In June, Domanko noted that "James Rist and Mike Picarella spend approx. 1hour+ per day loitering by my team's desk. . . . it is not work related. It is disruptive, they are both unproductive, they spend more time chatting and going for coffee than they do working." (Facts ¶ 187.) Busby also observed Rist and Picarella spending hours together talking in conference rooms for no business-related reasons. (Facts ¶¶ 188-89.) Like Domanko, Busby felt that this behavior by Rist was disruptive to the team. (Facts ¶¶ 189-90.)

In June and July, Busby tasked Rist with spearheading a sophisticated project concerning "P-Notes." (Facts ¶¶ 191-92.) Despite numerous e-mails and meetings, Rist could not advance the project and failed to grasp basic concepts. (Facts ¶ 193.) Busby wrote on June 21, 2013, that Rist "has not taken the lead" on the project despite having "been asked on multiple occasions to be point"; that Rist asked "extremely basic questions for some one at a senior level with his tenured experience"; that Rist "Falls constantly behind on projects and initiatives deadlines"; that Rist was "Consistently chased to complete tasks"; and that Rist "had been told an at least 15 / 20 occasions that he needs access to Qlickview to monitor client revenues." (Facts ¶ 195.) On July 22, 2013, Busby and Domanko again explained what the P-Notes project required, and noted Rist's frustration with taking on projects and his compensation; his reluctance to move forward with the P-Notes project; that he needed to follow up on outstanding issues; and that a document that Rist sent to Busby had a "poor" design, was "not clear," and was "missing all the key axes." (Facts ¶ 196.) Busby saw the P-Notes project as confirmation that Rist did not have the skills

required of someone at his level.  (Facts ¶ 194.)

In August, Domanko received a notification that Rist had failed to complete mandatory anti-money laundering training, that it was Domanko's "responsibility" to ensure that this training occurred on time, and that "senior leaders" would be informed that, due to Rist, Domanko's team was "overdue."  (Facts ¶¶ 199-200.)

Rist discussed his mid-year 2013 review with Domanko on or around September 20, 2013.  (Facts ¶¶ 201, 207.)    Rist (1) was not on track to achieve his two business objectives of trading with █ new clients and generating GNBV of ███████ (2) had not performed the "sales activities and marketing projects" assigned to him, including road shows, and had missed due dates; (3) needed to avoid "criticizing the decisions of the Trading desk and management in conversations with clients"; and (4) needed "a more disciplined approach to time management to be more productive during work hours.  Avoid long or frequent discussions of non-work matters. Keep extended absences from the desk to a minimum and when necessary, arrange for colleagues to cover Bloomberg chats and phones."  (Facts ¶¶ 203-06.)  Rist received a "4 – Inconsistent."  (Facts ¶ 202.)

Nothing improved in the second half of the year.  Domanko's 2013 year-end review of Rist noted that he had failed to meet his revenue goals, failed to meet his client development goals, failed to complete the projects he was assigned, and continued to spend "a disproportionate amount of time away from the desk."  (Facts ¶¶ 217-22.)  Indeed, Rist not only failed to complete a road show in 2013, but gave "no update or indication that he has planned a marketing road show for 2014, despite numerous requests to do so."  (Facts ¶ 220.)  The review also gave a specific example of Rist's shortcomings, noting that "One area of concern is James' ability to properly manage client expectations, particularly with regard to HSBC trading

10

mandates and limits.  One recent example was an order from ████████ in December on two large Mexican stock positions.  James displayed poor/average sales skills in managing the client order and he miscommunicated our internal approval process, causing the client to trade away.  This was a lost revenue opportunity of $500K+ annualized."  (Facts ¶ 219.)  Despite HSBC's "standard practice" of not granting a bonus to an employee who received a 4 in their year-end review, Rist was granted a discretionary bonus of ████.  (Facts ¶¶ 41, 224-25.)

Again, all of the relevant managers making these judgments—Busby, Domanko, McCormick, and O'Leary—have submitted unrebutted testimony that they knew nothing of Rist's alleged complaints regarding ████ at the relevant times.  (Facts ¶¶ 250-53, 255.)  Indeed, at his deposition, Rist was unable to identify any direct evidence for retaliatory animus or motive for Busby, Domanko, McCormick, Todd Fruhbeis, the Head of Wealth Management Sales, and to whom Domanko reported, or Carlos Pablo Pizzimbono, who at various times was Head of Fixed Income Sales or Head of Sales for HSBC Global Markets (Americas), and who was involved in some decisions that Rist complains were retaliatory.  (Facts ¶¶ 17-18, 23-24, 258-63.)  As a matter of undisputed fact, therefore, none of these individuals ever said anything to Rist that indicated that any action they took was motivated in any way by retaliation.  Domanko, Fruhbeis, and Busby were informed by HR only that, towards the end of 2012, Rist believed that he was being treated differently as a result of the April 18, 2012 incident in which his then-wife confronted ████ (Facts ¶¶ 165-70.)

**E.**      **In 2014, Rist Voluntarily Resigned from HSBC**

Rist received an offer of employment from ████████ on May 12, 2014.  (Facts ¶ 226.)  He resigned from HSBC on May 13, 2014, in order to accept that job offer.  (Facts ¶¶ 227-28.)  Rist's title—he is a Director of Prime Finance Sales/Trader—and salary—████████—at ████████ are comparable to his employment at HSBC.  (Facts ¶¶ 229-30.)

**F.     Rist's Allegations of Retaliation Are Unsupported**

Rist's first relevant meeting with Human Resources ("HR") was on June 1, 2012.[4]  (Facts ¶ 78.)  Both of the HR professionals present at the meeting—Jennifer Whang and Ellen Weiss— testified that the only topic of discussion was ████████ termination and that Rist did not make any complaints regarding ████████ alleged sexual harassment.  (Facts ¶¶ 79-82.)  On July 5, 2012, Rist again met with HR as part of the investigation into Hedges.  (Facts ¶ 113.)  As HR's contemporaneous notes of that meeting reflect, Rist stated that "he's heard complaints against Eileen [Hedges] as a manager from ████████████ but said he did not see anything directly so he cannot say if any of this is true."  (Facts ¶ 114.)  Far from engaging in relevant protected activity, therefore, Rist actually denied knowledge of the very facts of which he now claims to have complained.  The only written evidence of Rist ever raising any complaint regarding ████████ is when he filed his EEOC Charge on August 8, 2013.[5]  (Facts ¶¶ 113-14, 197.)

Rist's current testimony that he complained of sexual harassment experienced by ████████ is, therefore, contradicted both by contemporaneous and by testimonial evidence.  Even if this does not establish at summary judgment that Rist did not engage in protected activity, it does show what HSBC understood and memorialized from those meetings.  Thus, the unrebutted evidence that they never recorded or understood Rist to be complaining of sexual harassment supports HSBC's argument that Rist cannot show causation.

A couple of other incidents are worthy of note.  ████████████████████████████

---

[4] Rist originally alleged that he engaged in some form of protected activity on April 18, 2012—the day his then-wife came to the trading floor and confronted ████ (Ex. 71 at Interrogatory 3.)  There are, however, no contemporaneous notes or indications that this occurred, and no allegation of any such protected activity in Rist's EEOC Charge, nor any suggestion of it in the timeline of events Rist prepared in anticipation of his charge of discrimination filed with the Equal Employment Opportunity Commission ("EEOC Charge"), and when asked at his deposition, Rist could not recall any such protected activity.  (Facts ¶¶ 61-63.)  In sum, it did not occur.

[5] Allegedly adverse employment actions occurring more than 300 days prior to the filing of the EEOC Charge—*i.e.*, before October 12, 2012—are time barred on Rist's Title VII claim.  42 U.S.C. § 2000e-5(e)(1).  (Ex. 71 at Interrogatory 1 ("Rist states that he is not invoking the continuing violation doctrine.").)

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████

*Second*, in October 2012, Rist had a conversation with Suzy White, the Chief Operating

Officer for Global Markets (Americas) in the bar of a hotel in Toronto, Canada, while they were

both in town on independent business trips.  (Facts ¶¶ 156-58.)  O'Leary was also present during

the conversation.  (Facts ¶ 159.)  Rist has alleged that during that conversation White tied his

future advancement to Managing Director to his staying away from complaining about ███████

sexual harassment.  (Facts ¶ 160.)  In an e-mail exchange between himself and ██████ however,

Rist was confronted with this description of the meeting and wrote, "I don't know anything about

this," and "this is not accurate."  (Facts ¶ 161.)  Rist's own admission, therefore, confirms that

White never said any such thing.  Regardless, White was not in Rist's reporting line or group and

was not involved in any decision that Rist claims was retaliatory.  (Facts ¶¶ 21, 163.)

## Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In

determining whether a genuine issue of material fact exists for trial, [the court is] obliged

carefully to distinguish between evidence that allows for a reasonable inference of discrimination

and evidence that gives rise to mere speculation and conjecture.  A non-moving party cannot

avoid summary judgment simply by asserting a metaphysical doubt as to the material facts."

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005); *see Weinstock v. Col. Univ.*, 224

F.3d 33, 41 (2d Cir. 2000) ("The time has come, as James and Hazard put it, to put up or shut up.

Accordingly, unsupported allegations do not create a material issue of fact.").[6]  While "the court must assess the record in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor," *Weinstock*, 224 F.3d at 41, the Supreme Court has reiterated that trial courts should not "treat discrimination differently from other ultimate questions of fact," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 525 (1993).  Thus, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Plaintiff's claims for retaliation under Title VII and the NYSHRL are subject to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)."  *Rozenfeld v. MTA Bus Co.*, No. 13-cv-4847, 2015 WL 1174768, at *7 (S.D.N.Y. Mar. 16, 2015).  The first step in *McDonnell Douglas* requires Rist to establish a *prima facie* case—"that [i] he engaged in protected activity; [ii] the employer was aware of that activity; [iii] the employee suffered a materially adverse action; and [iv] there was a causal connection between the protected activity and that adverse action."  *Id.* at *8 (alterations in original).  If a *prima facie* case is established, "that shifts the burden of production to the defendant, who must proffer a legitimate, nondiscriminatory reason for the challenged employment action.  If the defendant articulates such a reason, the presumption of discrimination drops out, and the plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  In short, the ultimate burden rests with the plaintiff to offer evidence sufficient to support a reasonable inference that prohibited [retaliatory] discrimination occurred."  *Woodman*, 411 F.3d at 76.

---

[6] Unless otherwise noted, all internal citations, quotation marks, and brackets are omitted; all emphases are added.

14

"NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013). "[T]he NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives, or if the defendant proves the conduct was nothing more than petty slights or trivial inconveniences." *Id.* Summary judgment is appropriate where the "record conclusively shows that plaintiff cannot link her complained-of [treatment] to a retaliatory motivation." *Williams v. N.Y.C. Housing Auth.*, 61 A.D.3d 62, 71 (1st Dep't 2009).

## Argument

As an initial matter, in order for an employment action to be considered "adverse" for the purposes of a retaliation claim, the action must "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Here, Rist's own allegations show that he cannot argue that he or a reasonable worker would have been dissuaded. Rist claims that he engaged in protected activity and made complaints seventeen times between April 18, 2012, and August 8, 2013, when he filed his EEOC Charge. (Ex. 71 at Interrogatory 3.) Under such circumstances, Rist cannot show an adverse employment action and summary judgment is appropriate. *See McWhite v. N.Y.C. Hous. Auth.*, No. 05-cv-991, 2008 WL 1699446, at *13 (E.D.N.Y. Apr. 10, 2008) (granting summary judgment where the alleged adverse actions "did not deter plaintiff").

More generally, "[a]n adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006); *see Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 236 (E.D.N.Y. 2014) ("Title VII does not set forth a general civility code for the American workplace."). Under this standard, none of the following are adverse employment actions: "exclusion from certain

meetings"; an "'unsatisfactory' mark"; or a "notice of discipline" not accompanied by evidence that it affected the plaintiff's career. *Cotterell v. Gilmore*, No. 12-cv-3808, --- F. Supp. 3d ---, 2014 WL 6886079, at *14-17 (E.D.N.Y. Dec. 8, 2014).

**I.      Rist Cannot Establish a *Prime Facie* Case Because He Cannot Show Causation**

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). Under the NYCHRL, Rist must demonstrate a "link" between HSBC's actions and "a retaliatory motivation." *Williams*, 61 A.D.3d at 71.

The undisputed evidence demonstrates that such intent was impossible. All of the relevant decisionmakers—Busby, Domanko, Fruhbeis, McCormick, Pizzimbono, O'Leary, and George—have submitted unrebutted testimony that they did not know of Rist's supposed complaints of ▮▮▮ sexual harassment. (Facts ¶¶ 250-57.) Indeed, Busby and Domanko, Rist's most direct managers, were not even in Rist's group until after ▮▮▮ had left HSBC. (Facts ¶¶ 5, 16, 66.) Unsurprisingly, the law recognizes that a retaliatory intent is impossible where knowledge of the events supposedly retaliated against is absent. *See Woodman*, 411 F.3d at 87 ("To defeat summary judgment, [plaintiff] was obliged . . . to offer evidence indicating that persons who actually participated in her termination had such knowledge" of her protected classification.); *Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 278 (S.D.N.Y. 2008) ("Plaintiff must do more than produce evidence that someone at the defendant knew plaintiff was pregnant. She was obliged to offer evidence indicating that persons who actually participated in her termination decision had such knowledge."); *see also Duviella v. JetBlue Airways*, 353 F. App'x 476, 478 (2d Cir. 2009) (summary order) (citing *Woodman* and affirming summary judgment where "the only record evidence indicates that [decisionmaker] was unaware" of the protected classification). The affirmative evidence that no decisionmaker had knowledge of the

protected activity justifies summary judgment on all Rist's claims.

Rist has no evidence to rebut these facts.  At his deposition, Rist could only point to the reorganization and his bonuses coupled with "speculation" that the only explanation was retaliation.  (Facts ¶¶ 258-63.)  This is a far cry from direct evidence, however, which requires "a smoking gun or at least a thick cloud of smoke."  *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 153 (E.D.N.Y. 2013).  Evidence that could constitute such a "smoking gun" includes "'policy documents and evidence of statements or actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude.'"  *Ahmed v. Heartland Brewery L.L.C.*, No. 05-cv-2652, 2007 WL 2125651, at *4 (S.D.N.Y. July 25, 2007) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 60-61 (2d Cir. 1997)).

Rist's attempt to create an issue of fact regarding White's alleged implicit threat regarding Rist's prospects fails as well, if for no other reason than that statement would be a "stray remark."  The Second Circuit considers four factors in determining whether a remark is stray:  "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

Here, all four factors favor HSBC.  *First*, White had no supervisory authority over Rist. (Facts ¶ 21.)  *Second*, the alleged remark was not made proximately to any employment decision. Indeed, the supposed "decision" did not exist:  Rist does not claim that he was wrongly denied promotion to MD, and he has no evidence that he was or reasonably expected to be under consideration for MD when this supposed statement occurred.  *Third*, the alleged remark was

17

vague and unspecific.  *Fourth*, the alleged remark was made in a bar at a hotel and not during

any decision-making process.  (Facts ¶ 158.)  Under these circumstances, in particular because

there is no evidence that White was involved in any decision that affected Rist (Facts ¶ 163),

White's alleged remark was stray.  *See Sloan v. United Techs. Corp.*, 596 F. App'x 35, 36 (2d

Cir. 2015) (summary order) ("remarks by someone other than decision maker may have little

tendency to show that the decision-maker was motived by the discriminatory sentiment

expressed in the remark"); *Galimore v. City Univ. of N.Y. Bronx Cmty. Coll.*, 641 F. Supp. 2d

269, 284 (S.D.N.Y. 2009) (courts "assess the remarks' tendency to show that the decision-maker

was motivated by assumptions or attitudes relating to the protected class"); *Campbell v. Alliance*

*Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (finding that a supervisor's instruction to

plaintiff "not to hire anyone for the receptionist position who was not light-skinned or who had

an accent, braids, big earrings or nose rings" was an "isolated and stray remark" that did not

support race discrimination because "[s]tray remarks by non-decision-makers or by decision-

makers unrelated to the decision process are rarely given great weight, particularly if they were

made temporally remote from the date of decision").

Nor can Rist establish retaliatory intent through temporal proximity or similarly situated

individuals treated differently.  *See Smith v. Dep't of Corr.*, No. 07-cv-1862, 2009 WL 2487981,

at *4-5 (D. Conn. May 12, 2009) (finding *prima facie* case of retaliation not established where

neither was present).  As to temporal proximity, "a passage of more than two months between

the protected activity and the adverse employment action does not allow for an inference of

causation."  *Garrett v. Garden City Hotel, Inc.*, No. 05-cv-962, 2007 WL 1174891, at *21

(E.D.N.Y. Apr. 19, 2007) (collecting cases); *see Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268,

273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge

of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close."). Rist alleges that he complained of the sexual harassment of ████ on June 1, 2012.  In June or July 2012, Rist was not reviewed, and no bonus decisions were made.[7]  Rather, a department-wide reorganization began at this time, which did not impact Rist's title or salary.  (Facts ¶ 127.)

     With regards to comparators, the only similarly situated individuals were treated identically or worse.  The reorganization was department-wide and, as such, applicable to every employee, including Langworthy, whose reporting line also changed.  (Facts ¶ 93.)  Moreover, Rist's superior, McCormick, found himself reporting to someone who had previously been a peer.  (Facts ¶ 128.)  Domanko is not a comparator because he possessed a qualification that Rist lacked.  (Facts ¶¶ 129, 131.)  *See Risco v. McHugh*, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012) (comparators must be "similarly situated in all material respects"); *Virgona v. Tufenkian Import-Export Ventures, Inc.*, No. 05-cv-10856, 2008 WL 4356219, at *10 (S.D.N.Y. Sept. 23, 2008) (Lynch, J.) (finding no comparator due to a difference in qualifications).  More fundamentally, none of the employees at HSBC could serve as comparators because none had committed an infraction similar to the April 18, 2012 incident between Rist's wife and ████  *See Risco*, 868 F. Supp. 2d at 100-01 ("proposed comparator is not similarly situated in all material respects unless she engaged in all of the same misconduct as plaintiff, or at least committed the most serious of the infractions for which the plaintiff was subjected to an adverse employment action").  The one employee who comes close because he also received a rating of 4 on his mid-year 2012 performance review from McCormick was treated worse than Rist because he was terminated before the year's end.  (Facts ¶¶ 148-49.)

---

[7] Rist does not allege that the written warning he received for the April 18, 2012 incident between his wife and ████ was retaliatory.

In sum, although not its burden, HSBC presents direct evidence of the impossibility of causation whereas Rist cannot provide any evidence of retaliatory animus.  Summary judgment is, therefore, appropriate on all claims and the Court need not continue further in its analysis.

## II.    Rist Cannot Establish a *Prima Facie* Case of Constructive Discharge

Because Rist resigned to work for ███████████ his separation from HSBC was not an adverse action unless he can demonstrate constructive discharge, which requires that HSBC "deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign," and "cannot be shown if the employee merely disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer.  Nor is the test merely whether the employee's working conditions were difficult or unpleasant."  *Shapiro v. N.Y.C Dep't of Educ.*, 561 F. Supp. 2d 413, 424 (S.D.N.Y. 2008).  "This standard is higher than the standard for establishing a hostile work environment," which requires "that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723-25 (2d Cir. 2010).

This high standard cannot be met because Rist testified that circumstances were sufficiently bad to "force [him] to resign" "[s]hortly after June 2012," but he did not resign until May 2014.  (Facts ¶¶ 110-12, 227.)  *See Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 00-cv-6307, 2007 WL 259937, at *21 (S.D.N.Y. Jan. 29, 2007) ("A six month passage of time is sufficient to undermine a claim that working conditions were intolerable."); *Flaherty v. Metromail Corp.*, No. 98-cv-8611, 2001 WL 868011, at *5 (S.D.N.Y. July 31, 2001) (same for a period of "nearly six months").  Indeed, Rist made no attempt to seek alternative employment or to resign at the time he testified circumstances forced him to, and ultimately left HSBC only

because he had found a satisfactory alternative position.  (Facts ¶¶ 110-12, 228-30.)

The same result would be required even without delay.  In *Cortez v. Connecticut Department of Transportation*, as here, the plaintiff argued that his "superiors effectively removed the Plaintiff's job duties, created a hostile workplace and effectively conspired to deny him deserved promotional possibilities; thus forcing him to work in an environment where it was apparent he was no longer wanted."  606 F. Supp. 2d 246, 253 (D. Conn. 2009).  The court granted summary judgment to the defendant because the plaintiff proffered only his "own subjective reactions and beliefs," which could not establish that working was "objectively intolerable or that [defendant] acted with the intent to create a hostile environment."  *Id.*

The failure of Rist's constructive discharge claim also eliminates any possibility of post-resignation damages.  *See Tse v. UBS Fin. Servs., Inc.,* 568 F. Supp. 2d 274, 302-04 (S.D.N.Y. 2008) (Lynch, J.) (dismissing plaintiff's post-resignation back pay damages claims under Title VII, NYSHRL and NYCHRL); *Clark v. Gotham Lasik*, No. 11-cv-1307, 2013 WL 4437220, at *4 (S.D.N.Y. Aug. 20, 2013) ("The standards for awarding damages under the NYCHRL are identical to the standards used in Title VII discrimination cases.").

Rist's post-resignation damages are based on the amount he alleges he "would have earned at HSBC had he not been constructively terminated" minus the amount he alleges he has earned (or is projected to earn) at ▮▮▮▮▮▮  (Ex. 71 at Interrogatory 8.)  By his own admission, therefore, his entitlement to these damages requires constructive discharge.

More generally, a plaintiff may not receive post-resignation damages if the employment ended for reasons other than discrimination.  *See Tse*, 568 F. Supp. 2d at 302-04 (plaintiff not entitled to post-resignation damages when not terminated for discriminatory reasons); *Brady v. Wal-Mart Stores, Inc.,* No. 03-cv-3843, 2005 WL 1521407, at *5-6 (E.D.N.Y. June 21, 2005)

21

(no front or back pay where plaintiff failed to prove he was constructively discharged); *Rotert v. Jefferson Fed. Sav. & Loan Ass'n*, 623 F. Supp. 1114, 1119-20 (D. Conn. 1985) (Cabranes, J.) (no damages for the period following resignation where plaintiff was precluded from asserting that she was constructively discharged); *Rite Aid of N.Y., Inc. v. N.Y.S. Div. of Human Rights*, 875 N.Y.S.2d 708, 710 (4th Dep't 2009) (no post-resignation back pay under the NYSHRL when plaintiff not constructively discharged).  Thus, if the Court grants summary judgment on Rist's constructive discharge claim but not as to all claims, summary judgment must also be granted on post-resignation damages for the surviving claims.

### III.    HSBC Had Legitimate, Non-Discriminatory Reasons For Its Actions

Assuming that any of Rist's allegations state a *prima facie* case, they nonetheless fail because HSBC had legitimate, non-discriminatory reasons.  These reasons were: (1) Rist's poor performance; (2) reorganization of the Equities business; and (3) business judgment.

The statement of facts above outlines Rist's poor performance, justifying poor performance reviews and lower discretionary bonuses.  *See Davis v. Avaya, Inc.*, 295 F. App'x 380, 381 (2d Cir. 2008) (summary order) ("a failure to perform satisfactorily is a legitimate, nondiscriminatory reason"); *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 514-15 (S.D.N.Y. 2014) ("poor performance" as determined by a "supervisor and others who directly reviewed" plaintiff's work constituted "legitimate nondiscriminatory reasons"); *Sanzo v. Uniondale Union Free Sch. Dist.*, 381 F. Supp. 2d 113, 118-19 (E.D.N.Y. 2005) ("incidents of misconduct and incompetence" and "complaints of poor job performance" constitute "legitimate and nondiscriminatory reasons").

Similarly, to the extent that Rist complains of the reorganization and expansion of his department, those claims fail.  *See Watson v. Paulson*, 578 F. Supp. 2d 554, 566 (S.D.N.Y. 2008) ("reorganization" is a "legitimate, non-discriminatory reason" for an adverse employment event);

*John v. Dep't of Info. Tech. & Telecomms.*, No. 06-cv-13119, 2008 WL 4694596, at *4
(S.D.N.Y. Oct. 23, 2008) ("courts have found that an employer's reorganization can be a valid,
non-discriminatory reason to fire an employee," and an allegation that defendant "eliminated an
entire group of employees in order to discriminate" "strains credulity").

Finally, business judgment, which is also relevant to the reorganization of the Equities
business, is a legitimate purpose.  *See Pibouin v. CA, Inc.*, 867 F. Supp. 2d 315, 321 (E.D.N.Y.
2012) ("Federal courts do not have a roving commission to review business judgments, and may
not sit as super personnel departments, assessing the merits—or even the rationality—of
employers' non-discriminatory business decisions."); *Bussa v. Alitalia Linee Aeree Italiane,
S.p.A.*, No. 02-cv-10296, 2004 WL 1637014, at *9 (S.D.N.Y. July 21, 2004) ("[C]ourts may not
interfere with the employer's business judgment so long as that judgment is not exercised for
discriminatory reasons.").  Rist's remaining claims of retaliatory action, therefore, also fail.

Policies From the Reorganization.  In July of 2012, McCormick and Busby directed Rist
and Langworthy to introduce their clients to each other in order to provide primary and
secondary coverage.  (Facts ¶ 101.)  Busby was a particular champion of multiple contacts for
clients as a matter of professionalism and business development, and it was the way accounts had
been handled at Deutsche Bank, as well as being standard industry practice.  (Facts ¶¶ 102-04.)
Rist and Langworthy nonetheless had primary responsibility for between twenty and thirty
accounts.  (Facts ¶ 105.)

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

█████████

On July 20, 2012, McCormick removed himself and Rist from a weekly Sales Managers meeting and removed himself, Rist, and three other employees from a bi-weekly Hedge Fund focus meeting.  (Facts ¶¶ 117-18.)  Busby was added to those meetings in their place.  (Facts ¶¶ 117-18.)  Busby believed that it made strategic sense for him to represent the Equity Finance and Prime Finance teams at high-level meetings so that salespeople and traders, such as Rist and McCormick, could focus on monetizing HSBC's products.  (Facts ¶ 122.)  Busby then communicated any relevant information from these meetings back to all salespeople.  (Facts ¶ 123.)  In addition, Busby created new meetings, including a weekly sales meeting and account review meetings to which Rist was invited.  (Facts ¶¶ 124-25.)

Canada Desk.  In May 2012, before any alleged protected activity, HSBC considered a proposal to establish an equity brokerage business in Toronto, Canada.  (Facts ¶ 67.)  George and other senior managers ultimately decided not to allow the proposal to proceed for risk and strategy reasons (to this day, there is no such desk).  (Facts ¶¶ 71-72.)  Indeed, HSBC's internal assessment rated the proposal "HIGH" risk based, in part, on regulatory concerns.  (Facts ¶¶ 68-69.)  The Canadian government subsequently changed its budget such that the opportunity being investigated in 2012 would no longer be available to HSBC.  (Facts ¶ 73.)

## IV.     Rist's NYCHRL Claim Fails

The gravamen of an NYCHRL claim is the motivation of the employer.  *See Williams*, 61 A.D.3d at 71 (summary judgment appropriate where no retaliatory intent); *Quarless v. Brooklyn Botanic Garden Corp.*, No. 14-cv-2590, --- F. App'x ---, 2015 WL 2146248, at *2 (2d Cir. May

8, 2015) (summary order) (same); *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 456 (E.D.N.Y. 2013) ("[A] plaintiff must still establish that there was a causal connection between her protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for her termination was pretextual or motivated at least in part by an impermissible motive.").  As an initial matter, therefore, HSBC's direct evidence that there is no "causal connection" because none of the decisionmakers knew of the alleged protected activity, defeats Rist's NYCHRL claim.

Moreover, Rist's lack of evidence of causation and the existence of legitimate non-discriminatory reasons also warrant summary judgment.  *See Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739, 741 (2d Dep't 2013) ("nonretaliatory reasons for the challenged actions" warranted summary judgment for defendant); *Wilcox v. Cornell Univ.*, 986 F. Supp. 2d 281, 288 (S.D.N.Y. 2013) (lack of temporal proximity and "retaliatory nexus" warranted summary judgment); *Bryant v. Merrill Lynch, Pierce, Fenner & Smith*, No. 12-cv-2940, 2013 WL 2359109, at *5 (S.D.N.Y. May 30, 2013) ("Because the federal and state retaliation claims on which summary judgment is granted fail because of the absence of retaliatory animus, they also fail under the broader NYCHRL."); *Shih v. JPMorgan Chase Bank, N.A.*, No. 10-cv-9020, 2013 WL 842716, at *9 (S.D.N.Y. Mar. 7, 2013) (summary judgment warranted where defendant "proffered legitimate, non-retaliatory reasons for its actions that the plaintiff has not refuted").[8]

## Conclusion

For the foregoing reasons, the Court should grant summary judgment on all claims and dismiss this case in its entirety.

---

[8] In the alternative, "while courts in this District tend to retain jurisdiction over NYSHRL claims when deciding federal discrimination claims on the merits, they frequently decline to exercise supplemental jurisdiction over NYCHRL claims." *Guzman v. City of New York*, No. 13-cv-5445, --- F. Supp. 3d ---, 2015 WL 1239988, at *13 (S.D.N.Y. Mar. 18, 2015) (collecting cases); *see Johnson*, 2 F. Supp. 3d at 518 (granting summary judgment on federal discrimination claim and declining to exercise supplemental jurisdiction over an NYCHRL claim).

Dated: June 12, 2015

/s/ Damien J. Marshall
Damien J. Marshall
Camille Oberkampf
Ilana Miller
Joshua J. Libling
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Phone: (212) 446-2300
dmarshall@bsfllp.com
coberkampf@bsfllp.com
imiller@bsfllp.com
jlibling@bsfllp.com

Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, District of Columbia 20036
Phone: (202) 955-8206
Facsimile: (202) 530-9606
escalia@gibsondunn.com

*Attorneys for HSBC Securities (USA) Inc.*