UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES RIST,

                              Plaintiff,                    14-cv-6503 (ALC) (AJP)

          -against-                                         **DEFENDANT'S RULE
                                                            56.1 STATEMENT OF
HSBC SECURITIES  (USA) INC.,                                MATERIAL FACTS**

                              Defendant.

          Pursuant to Local Civil Rule 56.1, Defendant  HSBC Securities  (USA) Inc. submits  the

following  statement  of material  facts in support of its motion  for summary  judgment.

I.        **Parties**

1.        Defendant  HSBC Securities  (USA) Inc. ("HSBC")  is a Delaware  corporation  with  its

principal  place of business  at 452 Fifth  Avenue,  New York, New York 10018.  Marshall

Declaration  Exhibit  ("Ex.")  65 (Compl.  ¶ 2); Ex. 66 (Answer  ¶ 2).

2.        Plaintiff  James Rist was formerly  employed  by Defendant  from on or about September  7,

2010, until  December  23, 2012, and by HSBC Bank (USA) ("HSBC Bank")  from December  24,

2012 until  May 14, 2014. Ex. 72 (Pl.'s Resp. to Def.'s First Set of Reqs. for Admis.

("Admissions")  at Req. 34); Ex. 4 (HSBCRIST00000003 at 03); Ex. 66 (Answer  ¶ 1).

3.        Prior to working  at HSBC, Rist was employed  at Banco Santander.  Ex. 80 (Rist 47:20-

24).

4.        Rist's annual  salary at Banco Santander  was ████  Ex. 72 (Admissions  at Req. 37).

1

**II.     Other Relevant Individuals**

5.     Paul Busby has been a Managing Director and Head of Prime Finance Sales (Americas) since July 2012 when he joined HSBC.  Ex. 84 (Busby Decl. ¶ 1).

6.     Busby had functional supervisory responsibility over Rist beginning approximately six months after Busby joined HSBC until Rist resigned from HSBC in May of 2014.  Busby also had functional supervisory responsibility over Ted Langworthy.  Ex. 84 (Busby Decl. ¶ 3).

7.     Since 2008, Patrick George has been the Global Head of Equities for HSBC Group. George is employed by HSBC Bank plc.  Ex. 85 (George Decl. ¶ 1).

8.     George is based in London and approximately 700 employees report in to George from the Americas, Asia, Europe, and the Middle East.  Ex. 85 (George Decl. ¶ 1).

9.     George had no direct supervisory role over Rist.  Ex. 85 (George Decl. ¶ 5).

10.     Tom O'Leary has been a Managing Director and the Head of Equities (Americas) since March 2010 when he joined HSBC.  Ex. 83 (O'Leary Decl. ¶ 1).

11.     Rist did not report directly to O'Leary but O'Leary had supervisory responsibility over the Equity Finance/Delta 1 sales team in which Mr. Rist worked.  Ex. 83 (O'Leary Decl. ¶ 2).

12.     Warren McCormick is a Managing Director and the Head of Equity Finance (Americas). Ex. 7 (HSBCDLTDOC-00012424 at slide 20).

13.     McCormick was Rist's direct supervisor from the time Rist joined HSBC in 2010 until in or around mid-2012.  Ex. 79 (McCormick 48:16-21, 186:5-8).

14.     Rob Domanko joined HSBC in or around April 2012 as Head of Institutional Equity Derivative Sales (Americas).   Ex. 76 (Domanko 11:16-19, 16:9-20).

15.     Domanko became Head of Institutional Equity Derivative & Equity Finance Sales (Americas) in or around August 2012.  Ex. 22 (HSBCRIST00025294).

16. Domanko became Rist's and Langworthy's direct supervisor beginning in or around August or September 2012. Ex. 76 (Domanko 18:3-15); Ex. 22 (HSBCRIST00025294).

17. Todd Fruhbeis is the Head of Wealth Management Sales (Americas). Ex. 21 (HSBCPIC-RIST00000547 at 49).

18. Rist did not report directly to Fruhbeis but Fruhbeis had supervisory responsibility over the Equity Finance/Delta 1 sales team in which Mr. Rist worked. Ex. 77 (Fruhbeis 18:19 – 19:6, 96:5-19).

19. Langworthy joined HSBC as a Senior Vice President on the Equity Finance sales desk in or around mid-2012. Ex. 79 (McCormick 164:8-16).

20. Suzanna ("Suzy") White has been a Managing Director and Chief Operating Officer for Global Markets (Americas) since in or around November 2011. Ex. 87 (White Decl. ¶ 1).

21. White was not in Rist's direct reporting line, and had no supervisory authority over him. Ex. 7 (HSBCDLTDOC-00012424 at slides 10 n.1 & 20); Ex. 87 (White Decl. ¶ 2); Ex. 83 (O'Leary Decl. ¶ 11).

22. White never worked directly with Rist. Ex. 87 (White Decl. ¶ 2).

23. Carlos Pablo Pizzimbono was employed at HSBC from February 2002 until November 2014 and during this time Pizzimbono held a number of senior roles within Global Markets (Americas). Ex. 86 (Pizzimbono Decl. ¶ 1).

24. Rist did not report directly to Pizzimbono. Ex. 7 (HSBCDLTDOC-00012424 at slide 1).

25. ██████████ is a former employee of HSBC who alleged that certain employees at HSBC had sexually harassed her. Ex. 65 (Compl. ¶¶ 11-12); Ex. 66 (Answer ¶¶ 11-12).

26. Michael Picarella is a former employee of HSBC who is the plaintiff in *Picarella v. HSBC Securities (USA) Inc.*, No. 14 Civ. 4463 (S.D.N.Y.). Ex. 67 (Second Am. Compl. ¶ 1,

*Picarella v. HSBC Securities (USA) Inc.*, No. 14 Civ. 4463 (S.D.N.Y. Mar. 30, 2015)); Ex. 68

(Ans. & Defs. to Second Am. Compl. ¶ 1, *Picarella v. HSBC Securities (USA) Inc.*, No. 14 Civ.

4463 (S.D.N.Y. Apr. 23, 2015)).

27.     Picarella and ▮▮▮▮ both reported to Eileen Hedges, Senior Vice President, Head of

Business Development Americas.   Ex. 7 (HSBCDLTDOC-00012424 at slide 10).

28.     Hedges reported to White.   Ex. 7 (HSBCDLTDOC-00012424 at slide 10 n.1).

29.     Hedges was not in Rist's direct reporting line, and had no supervisory authority over him.

Ex. 7 (HSBCDLTDOC-00012424 at slides 10 & 20); Ex. 80 (Rist 12:17-22).

30.     Picarella was not in Rist's direct reporting line, and had no supervisory authority over

him.   Ex. 7 (HSBCDLTDOC-00012424 at slides 10 & 20); Ex. 80 (Rist 14:10-15).

31.     ▮▮▮▮ was not in Rist's direct reporting line, and had no supervisory authority over him.

Ex. 7 (HSBCDLTDOC-00012424 at slides 10 & 20); Ex. 80 (Rist 14:5-9).

**III.     Rist's Early Employment at HSBC (2010 – 2011)**

32.     Rist was hired by HSBC in 2010 as a Senior Vice President in the Equity Finance group.

Ex. 2 (HSBCRIST00000025 at 25); Ex. 80 (Rist 47:18-19).

33.     Rist's initial salary at HSBC was ▮▮▮▮ per annum.   Ex. 2 (HSBCRIST00000025 at

25).

34.     Rist's offer letter stated his eligibility for "a discretionary bonus for performance year

2010."   Ex. 2 (HSBCRIST00000025 at 27).

35.     Rist's offer letter included a "conditional guaranteed bonus" for 2010 of ▮▮▮▮

conditional upon the 2010 Equity Finance Lat Am revenue generation of USD ▮▮▮▮ "   Ex.

2 (HSBCRIST00000025 at 25).

36.     2010 was the only year for which HSBC provided Rist a "conditional guaranteed bonus." Ex. 2 (HSBCRIST00000025).

37.     Rist's offer letter noted that: "Any discretionary bonus will be awarded at the sole discretion of the Company and based on factors including the performance and profitability of the Company and your business area, as well as your own performance and profitability." Ex. 2 (HSBCRIST00000025 at 27); Ex. 69 (HSBCRIST00030302 at 02-03).

38.     Rist was eligible for a discretionary bonus during his tenure at HSBC. Ex. 77 (Fruhbeis 74:10 – 75: 11); Ex. 82 (Whang 71:18 –72:9).

39.     Rist joined HSBC to "focus on developing [HSBC's] Lat Am [Latin America] franchise." Ex. 4 (HSBCRIST00000003 at 04).

40.     At the time, HSBC employees' ratings were calibrated as follows: 20% of employees received either a "1-Exceptional" or "2-Outstanding" rating, 70% of employees received a "3-Strong", and 10% of employees received either a "4-Inconsistent" or "5-Poor" rating. Ex. (HSBCPIC-RIST00003784 at slide 2); Ex. 77 (Fruhbeis 97:3-13).

41.     As a standard practice, HSBC does not provide discretionary bonuses to employees who receive a full-year rating of 4 or lower. Ex. 79 (McCormick 235:24 – 236:7).

42.     In his year-end 2010 review, McCormick gave Rist a rating of "3." Ex. 4 (HSBCRIST00000003 at 03-04).

43.     For 2011, the base salary associated with Rist's position was increased to ███. Ex. 80 (Rist 53:4-8); Ex. 69 (HSBCRIST00030302 at 02).

44.     ████████████████████████████████████████
████████████████████████████████████████

██████████████████████████████████████████████████

██

45.     In his mid-year 2011 review, Rist received a rating of "2." Ex. 5 (HSBCRIST00000128 at 30).

46.     Rist's mid-year 2011 review noted that as HSBC's "Lat Am cash capacity solutions come on-line," Rist "should look to refocus his efforts on his core responsibility of building out our Lat Am franchise and profitability." Ex. 5 (HSBCRIST00000128 at 30).

47.     Rist's mid-year 2011 review was completed by McCormick. Ex. 5 (HSBCRIST00000128 at 28).

48.     As of November 2011, Rist reported to McCormick. Ex. 7 (HSBCDLTDOC-00012424 at slide 20).

49.     In his year-end 2011 review, Rist received a rating of "2." Ex. 9 (HSBCRIST00000006 at 09).

50.     Rist's year-end 2011 review noted that he "was successful in raising our profile directly with clients and the internal Sales forces and RM network, whilst this development was incredibly pleasing, on a negative note neither James or the group as a whole were able to monetize these efforts. Needless to say this needs to be a focus for the group in 2012 and the anticipated head count increase in US will enable James to refocus his efforts on a revenue generation rather than an origination sales role. To support this James will have a specific target GNBV for the first time in 2012." Ex. 9 (HSBCRIST00000006 at 09).

51.     For 2011, Rist received a bonus of ████████ Ex. 80 (Rist 53:4-8); Ex. 8 (HSBCRIST00003208 at 08).

52.     Rist's 2011 bonus was discretionary. Ex. 80 (Rist 55:13-18).

**IV.    Rist's Recent Employment  at HSBC (2012 – 2013)**

53.     2012 was the first year for which Rist had a Gross New Business  Value ("GNBV")

target.  Ex. 6 (HSBCRIST00028850 at 55); Ex. 9 (HSBCRIST00000006 at 09); Ex. 80 (Rist 63:9

– 64:14).

54.     Rist understood  that he needed to "refocus" on revenue generation  in 2012.  Ex. 9

(HSBCRIST00000006 at 09); Ex. 80 (Rist 66:18-23).

55.     On or around April 18, 2012, Pamela Rist, Rist's then-wife,  came to the HSBC trading

floor and accused ▮▮▮▮ of having  an affair with Rist.  Ex. 72 (Admissions  at Req. 4); Ex. 12

(HSBCRIST00000138).

56.     As a result of Ms. Rist's visit, Rist received a written  warning  from HSBC.  Ex. 72

(Admissions  at Req. 7); Ex. 12 (HSBCRIST00000138).

57.     That written  warning  stated as follows:

> This warning  is being  issued as a result of an event that occurred on April 18th.  It
> was brought  to Senior  Management's  attention  that your wife was on the trading
> floor and approached ▮▮▮▮▮▮ accusing  her of having  an affair  with you.
>
> As you know, HSBC is committed  to creating and maintaining a collegial and
> professional work environment.  As a Senior Vice President of the firm,  your
> connection  to this incident  showed a lack of professional  judgment.
>
> As a result of this circumstance,  this warning  is being  issued to you.  Please note
> that should another  incident  occur, this could lead to your termination  from
> HSBC.

Ex. 12 (HSBCRIST00000138).

58.     The only written  response Rist provided to the warning  did not take responsibility  for the

trading  floor incident  on the grounds that he was not present at the incident  and did not know it

would occur: "I did not sign my wife in—nor did I have any idea she was coming  to the office.  I

did not know she would be invited  onto the floor  or sit at my desk." Ex. 12

(HSBCRIST00000138).

59.     In 2012, Rist was having a sexual relationship with ███ Ex. 65 (Compl. ¶ 13); Ex. 80 (Rist 74:13-19, 80:2-5).

60.     Rist engaged in at least one additional sexual relationship with another HSBC employee in 2012. Ex. 61 (HSBCRIST00005578 at 79); Ex. 80 (Rist 75:23-25).

61.     There are no contemporaneous notes of any alleged complaint or report or other protected activity by Rist on April 18, 2012. Ex. 72 (Admissions at Req. 3).

62.     Any alleged report, complaint, or other protected activity by Rist on April 18, 2012, is absent from a timeline of events that Rist prepared in August 2013 in anticipation of litigation and is absent from his charge of discrimination filed with the Equal Employment Opportunity Commission on August 8, 2013 ("EEOC Charge"). Ex. 54 (Rist000130 at timeline pages 1-4); Ex. 55 (HSBCRIST00000232 at 33-48).

63.     Rist did not engage in any protected activity on April 18, 2012. Ex. 72 (Admissions at Req. 3); Ex. 54 (Rist000130 at timeline page 1); Ex. 80 (Rist 73:19-23).

64.     During interviews with HR following the incident on the trading floor, ███ lied at least twice about whether or not she and Rist were having an affair. Ex. 11 (HSBCPIC-RIST00001162 at 62-63); Ex. 81 (Weiss 51:9-18).

65.     HSBC's policies provide that failure to cooperate during an investigation can be grounds for termination. Ex. 63 (HSBCPIC-RIST00000005 at 06); Ex. 70 (HSBCPIC-RIST00002174 at 82).

66.     ███ was terminated on May 31, 2012. Ex. 56 (Compl. ¶ 13); Ex. 66 (Answer ¶ 13).

67.     In early-to-mid 2012, HSBC considered a proposal to establish an equity brokerage entity in Toronto, Canada. Ex. 10 (HSBCRIST00028831); Ex. 79 (McCormick 103:11-24); Ex. 85 (George Decl. ¶ 2); Ex. 80 (Rist 25:20-25); Ex. 86 (Pizzimbono Decl. ¶ 3).

68.     HSBC's New Business Review Committee Pipeline Submission gave a "Risk Grading" of "HIGH" to the plan to set up a desk in Toronto.  Ex. 10 (HSBCRIST00028831 at 35).

69.     HSBC's New Business Review Committee Pipeline Submission gave specific reasons for its risk rating, including highlighting regulatory risk.  Ex. 10 (HSBCRIST00028831 at 34).

70.     Had HSBC set up a desk in Canada, Rist would have been one of the people considered to work on that desk.  Ex. 79 (McCormick 103:11-21).

71.     George and his colleagues decided not to allow the Canada business proposal to proceed because opening an equities business in Canada was not part of HSBC's global sales strategy and because HSBC could service its Canadian clients from its New York office.  Ex. 85 (George Decl. ¶ 2.)

72.     In addition, the proposal was viewed as too risky for HSBC from a regulatory and tax perspective.  Ex. 79 (McCormick 104:20 – 105:4).

73.     More recently, the Canadian government changed its budget such that the opportunity being investigated in 2012 would no longer be available to HSBC.  Ex. 79 (McCormick 103:25 – 104:7).

74.     At the time George made the decision not to move forward with the proposal, he did not know Rist would be under consideration for a position if the proposal did move forward.  Ex. 85 (George Decl. ¶ 3).

75.     At the time George made the decision not to move forward with the proposal, he did not know of any complaints Rist alleges he made regarding ██████ sexual harassment.  Ex. 85 (George Decl. ¶ 6).

76.     Pizzimbono was involved in the decision not to proceed with the Canada proposal.  Ex. 86 (Pizzimbono Decl. ¶ 3).

77.     At the time of the Canada proposal, Pizzimbono did not know of any complaint Rist alleges he made regarding ▮▮▮▮ sexual harassment.   Ex. 86 (Pizzimbono Decl. ¶¶ 5-7).

78.     Rist met with HR on June 1, 2012. Ex. 82 (Whang 94:3-16); Ex. 81 (Weiss 97:11-20).

79.     At the meeting on June 1, 2012, Rist discussed ▮▮▮▮ termination.   Ex. 82 (Whang 94:12-16); Ex. 81 (Weiss 97:3 – 99:18).

80.     At the meeting on June 1, 2012, Whang did not understand Rist to have complained about Hedges' sexual harassment of ▮▮▮▮ Ex. 82 (Whang 94:12-16, 96:9-10).

81.     At the meeting on June 1, 2012, Weiss did not understand Rist to have complained about Hedges' sexual harassment of ▮▮▮▮ Ex. 81 (Weiss 98:24 – 99:18).

82.     There are no contemporaneous notes of any alleged complaint or report or other protected activity by Rist on June 1, 2012. Ex. 72 (Admissions at Req. 13); Ex. 82 (Whang 45:22 – 46:2).

83.     Rist's wife filed for divorce in June 2012. Ex. 72 (Admissions at Req. 24).

84.     The Rists' divorce proceeding was contentious and involved child custody disputes. Ex. 13 (Rist Ex. 19); Ex. 24 (HSBCRIST00003363); Ex. 25 (HSBC00003369); Ex. 26 (HSBCRIST00003366).

85.     HSBC investigated charges that Hedges engaged in inappropriate conduct of a sexual nature at work. Ex. 14 (HSBCPIC- RIST00002204 at 04-06); Ex. 18 (HSBCPIC-RIST00002200 at 00-01).

86.     Hedges was punished for her conduct. Ex. 23 (HSBCPIC-RIST00003043); Ex. 20 (HSBCPIC-RIST00001030 at 30-31); Ex. 19 (HSBCPIC-RIST00002202); Ex. 78 (Hedges 69:24 – 70:14).

87.     On July 24, 2012, Hedges was removed from her management role. Ex. 19 (HSBCPIC-RIST00002202).

88.     Hedges' compensation was impacted and she received a final written warning.  Ex. 23 (HSBCPIC-RIST00003043); Ex. 75 (Descamps 9:23 – 10:3).

89.     Hedges also was required to attend a day-long "1:1 training course with outside counsel" that focused "on how behavior and poor judgment can lead to risk for both [HSBC] and [Hedges] personally."  Ex. 19 (HSBCPIC-RIST00002202); Ex. 78 (Hedges 69:24 – 70:14).

90.     In early-to-mid 2012, HSBC senior managers, including Patrick George and Tom O'Leary, were involved in HSBC's expansion and reorganization of its Equity Finance/Delta 1, Prime Finance and Equity Derivative groups.  Ex. 22 (HSBCRIST00025294); Ex. 79 (McCormick 143:21 – 144:2); Ex. 84 (Busby Decl. ¶ 4); Ex. 83 (O'Leary Decl. ¶ 3).

91.     One of the reasons for the reorganization was to better align with the structure HSBC used in Hong Kong and London.  Ex. 79 (McCormick 143:21 – 144:2).

92.     Another reason for the reorganization was to formalize the split between salespeople and traders such that salespeople would report directly to a sales manager and traders would report to a manager in charge of trading.  Ex. 76 (Domanko 14:25 – 16:3); Ex. 79 (McCormick 143:21 – 144:16).

93.     As part of the reorganization, all of the salespeople in the Equity Finance/Delta 1 and Equity Derivative groups, including Rist and Langworthy, were consolidated under one reporting line in or around August 21, 2012.  Ex. 22 (HSBCRIST00025294).

94.     When Langworthy joined HSBC, he and Rist were the only salespeople on the Equity Finance/Delta 1 desk.  Ex. 80 (Rist 113:8-15).

95.     Busby joined HSBC in or around July 2012, shortly after Langworthy was hired.  Ex. 84 (Busby Decl. ¶¶ 1, 5).

96.     At the time of his hire, Busby's role was newly created as part of HSBC's significant investment in developing its customer franchise for the Equity Finance and Prime Finance platforms.   Ex. 84 (Busby Decl. ¶ 4); Ex. 83 (O'Leary Decl. ¶¶ 3, 5).

97.     Busby was hired to spearhead the effort to expand and grow the Equity Finance and Prime Finance platforms.   Ex. 84 (Busby Decl. ¶ 4); Ex. 83 (O'Leary Decl. ¶ 5).

98.     Busby has over 18 years of experience in developing equity finance and prime finance platforms for large, institutional banks and previously supervised a team of over 25 people as a Managing Director and Co-Head of Equity Finance at Deutsche Bank. Ex. 84 (Busby Decl. ¶ 2).

99.     Langworthy and Busby had worked together at their previous employer, Deutsche Bank. Ex. 84 (Busby Decl. ¶ 5).

100.    Langworthy and Rist were peers who both held the title of Senior Vice President at HSBC. Ex. 21 (HSBCPIC-RIST00000547 at 49); Ex. 84 (Busby Decl. ¶ 5); Ex. 80 (Rist 47:18-19).

101.    McCormick and Busby directed Rist and Langworthy to share client contacts with one another such that every client would have both primary and secondary coverage. Ex. 79 (McCormick 164:17 – 165:13); Ex. 84 (Busby Decl. ¶ 11).

102.    Having secondary coverage on an account was standard practice designed to ensure that there would always be a knowledgeable salesperson available if a client called. Ex. 79 (McCormick 164:17 – 165:13); Ex. 84 (Busby Decl. ¶ 11); Ex. 83 (O'Leary Decl. ¶ 6).

103.    Busby followed this practice when he was at Deutsche Bank. Ex. 84 (Busby Decl. ¶ 11).

104.    Busby was a strong believer in having multiple touch points for clients as a matter of professionalism and business development.   Ex. 84 (Busby Decl. ¶ 11).

105.    At any one time, Rist and Langworthy each had primary responsibility for approximately twenty and thirty accounts.  Ex. 76 (Domanko 28:19 – 29:10); Ex. 74 (Busby Decl. ¶ 12).



109.    Rist's managers noted that Rist was displeased with the expansion and reorganization of the business unit in which he sat.  Ex. 84 (Busby Decl. ¶ 6); Ex. 83 (O'Leary Decl. ¶ 6).

110.    Rist believed that "[s]hortly after June 2012," "the conditions" of Rist's employment at HSBC were sufficiently bad that he was "force[d] . . . to resign."  Ex. 80 (Rist 130:24 – 135:12).

111.    Rist did not resign in or around June 2012.  Ex. 72 (Admissions at Req. 34).

112.    Rist did not look for a job outside of HSBC in or around June 2012.  Ex. 80 (Rist 57:17-19).

113.    On July 5, 2012, Rist met with Whang as part of an investigation into Hedges.  Ex. 14 (HSBCPIC- RIST00002204 at 06).

114.    The only notes of that July 5 meeting state that Rist had "heard complaints against Eileen [Hedges] as a manager from ▇▇▇▇▇▇▇ but said he did not see anything directly so he cannot say if any of this is true."  Ex. 14 (HSBCPIC-RIST00002204 at 06).

115.    In or around July 2012, Rist was unable to complete a business trip to Brazil as a result of issues in his personal life.  Ex. 15 (HSBCRIST00003000); Ex. 80 (Rist 69:11-22, 70:10-17).

116.    Rist also missed additional business trips as a result of issues in his personal life, including at least one to Canada. Ex. 80 (Rist 71:2-11); Ex. 15 (HSBCRIST00003000).

117.    On July 20, 2012, McCormick removed both himself and Rist from a weekly Sales Managers meeting because Busby would "fully represent Prime Services and Equity Finance." Ex. 17 (Rist 001172); Ex. 84 (Busby Decl. ¶ 7).

118.    On July 20, 2012, McCormick removed himself, Rist and three employees from the Prime team in London from a bi-weekly Hedge Fund focus meeting because Busby would "be able to fully represent Prime on the various Fund On-boarding and HF Co-ordination meetings." Ex. 16 (Rist 001173); Ex. 84 (Busby Decl. ¶ 7).

119.    At the time McCormick removed himself, Rist and others from these meetings, McCormick did not know of any complaints Rist alleges he made regarding ████ sexual harassment.   Ex. 79 (McCormick 239:6-10).

120.    McCormick was not a sales manager when he removed himself from the Sales Manager meetings.   Ex. 79 (McCormick 158:13 – 25).

121.    Rist was not a sales manager when he was removed from the Sales Manager meetings. Ex. 79 (McCormick 158:13 – 25).

122.    Busby believed that it made strategic sense for him to represent the Equity Finance and Prime Finance teams at high-level meetings so that salespeople and traders, such as Rist and McCormick, could focus on monetizing HSBC's products. Ex. 84 (Busby Decl. ¶ 7).

123.    Busby communicated any relevant information from these meetings back to all salespeople. Ex. 84 (Busby Decl. ¶ 7).

124.    Busby also created new meetings, including a weekly sales meeting to which Rist was invited.  Ex. 84 (Busby Decl. ¶ 8).

125.    Busby also held account review meetings to examine specific clients, to which Rist was invited.  Ex. 84 (Busby Decl. ¶ 8).

126.    As part of the reorganization in mid-2012, Rist's direct reporting line was changed such that he now reported to Domanko, Head of Institutional Equity Derivative & Finance Sales (Americas).  Ex. 21 (HSBCPIC-RIST00000547 at 49); Ex. 22 (HSBCRIST00025294).

127.    At the end of the reorganization, Rist's title and salary were unchanged.  Ex. 22 (HSBCRIST00025294); Ex. 34 (HSBCRIST00003210 at 10); Ex. 84 (Busby Decl. ¶ 4).

128.    As part of the reorganization, McCormick's direct reporting line was changed such that he reported to someone who had previously been at McCormick's same reporting level.  Ex. 80 (Rist 114:22 – 115:8); Ex. 79 (McCormick 143:12 – 144:16).

129.    In August 2012, Domanko possessed a FINRA Series 9/10 License.  Ex. 76 (Domanko 15:19-22).

130.    A FINRA Series 9/10 License is awarded upon passing the General Securities Sales Supervisor Examination, which is "intended to test a candidate's knowledge of securities industry rules and certain statutory provisions applicable to the supervision of sales activities at a general securities-oriented branch office."  Ex. 74 (FINRA Series 9 and 10 - General Securities Sales Supervisor Examination at 1); Ex. 76 (Domanko 15:19-22).

131.    At the time of the reorganization, Rist did not possess a Series 9/10 License.  Ex. 72 (Admissions at Req. 38); Ex. 80 (Rist 115:20-22).

132.    Part of the reason that Domanko was chosen as a manager for Rist and Langworthy was that his Series 9/10 License would ameliorate regulatory concerns spurred by then-pending regulations related to the Dodd-Frank Act.  Ex. 76 (Domanko 14:22 – 16:3); Ex. 77 (Fruhbeis 18:19-24).

133.    In addition to possessing his Series 9/10 License, another reason Domanko was qualified for the position was because he had previously supervised salespeople on equity derivatives sales desks at Morgan Stanley and at Merrill Lynch.   Ex. 83 (O'Leary Decl. ¶ 4); Ex. 76 (Domanko 9:5-8, 10:4-11).

134.    As of August 2012, Domanko reported to Fruhbeis.   Ex. 21 (HSBCPIC-RIST00000547 at 49).

135.    Rist had 7:45 a.m. meetings with Domanko and the rest of their team at least once per week.  Ex. 80 (Rist 46:4-24).

136.    Domanko perceived Rist as someone who was commonly late to work in 2012 and early 2013.  Ex. 37 (HSBCRIST00003302); Ex. 39 (Rist002208).

137.    George directed McCormick to grade his direct reports to a higher standard for mid-year 2012 than he had graded his reports in 2011, because the equities division was underperforming financially.  Ex. 79 (McCormick 71:17 – 72:24).

138.    O'Leary told McCormick that he believed Rist should be rated a 4.  Ex. 79 (McCormick 168:13-23).

139.    Rist's mid-year 2012 review was discussed with him on or around August 30, 2012.  Ex. 47 (HSBCRIST00003232 at 32).

140.    In his mid-year 2012 review, Rist received a rating of "4 – Inconsistent."  Ex. 47 (HSBCRIST00003232 at 36).

141.    His mid-year 2012 review noted that Rist "had a somewhat inconsistent start to the year in challenging personal circumstances but has shown that he is committed to the Group and to the product offering."  Ex. 47 (HSBCRIST00003232 at 36).

142.    Rist sent his mid-year 2012 review to his divorce attorney, Laura Goldstein, on August 30, 2012, and stated: "pls see attached .... as it references my personal issues ..." Ex. 28 (Rist003088 at 89).

143.    Rist's mid-year 2012 review further stated, that "Lat Am revenues have been disappointing to all." Ex. 47 (HSBCRIST00003232 at 36).

144.    Rist's mid-year 2012 review further stated, "I have no doubt that if James continues to demonstrate the focus and drive he showed with this customer across the product and wider client base the resultant p&l (and full year rating) will reflect this." Ex. 47 (HSBCRIST00003232 at 36).

145.    Rist's mid-year 2012 review was completed by McCormick. Ex. 47 (HSBCRIST00003232 at 36).

146.    At the time he wrote Rist's mid-year 2012 review, McCormick did not know of any complaints Rist alleges he made regarding ███ sexual harassment. Ex. 79 (McCormick 239:6-10).

147.    At the time of Rist's mid-year 2012 review, Domanko did not know of any complaints Rist alleges he made regarding ███ sexual harassment. Ex. 76 (Domanko 133:18 – 134:14).

148.    McCormick gave a 4 to one other HSBC employee in that mid-year cycle. Ex. 79 (McCormick 188:14-24, 234:18 – 235:5).

149.    The other employee who received a 4 in his mid-year 2012 performance review from McCormick was terminated later in 2012. Ex. 79 (McCormick 189:6-9, 235:3-5).

150.    Rist and the other employee to receive a 4 in his mid-year 2012 performance review were the only people about whom McCormick was expressing concerns regarding performance at that time. Ex. 79 (McCormick 221:25 – 222:8).

151.    In the second half of 2012 or early 2013, Rist confirmed to his managers that he would attend a client meeting in Montreal and then did not show up without providing a prior explanation.   Ex. 36 (HSBCRIST00004892 at 92-94).

152.    Within the first 3-6 months of joining HSBC, Busby determined that Rist did not perform at the level required of a Senior Vice President.   Ex. 84 (Busby Decl. ¶ 15).

153.    Busby's determination was based on his observations that Rist displayed poor attention to detail, consistently missed deadlines, failed to take initiative, provided excuses rather than solutions, had to be reminded continuously to complete his tasks, often arrived at meetings unprepared, and exhibited unprofessional behavior in front of clients, including showing up late to meetings, sometimes unshaven and not dressed appropriately in a suit and tie. Ex. 84 (Busby Decl. ¶ 15).

154.    Bubsy further concluded that Rist was generally resistant to his ideas and generally questioned Busby's attempts to grow the business.   Ex. 84 (Busby Decl. ¶ 15).

155.    Busby met with Rist on many occasions to help him succeed in the new team structure. Ex. 84 (Busby Decl. ¶¶ 9, 17).

156.    In October 2012, White was in Toronto, Canada on HSBC business.   Ex. 87 (White Decl. ¶ 4).

157.    Rist and O'Leary were also in Toronto in October 2012 for a different business purpose. Ex. 87 (White Decl. ¶ 4); Ex. 83 (O'Leary Decl. ¶ 11).

158.    While staying at the same preferred hotel for HSBC employees in Toronto, Rist and White had a conversation in the hotel bar. Ex. 87 (White Decl. ¶ 4); Ex. 80 (Rist 37:17 – 38:10); Ex. 83 (O'Leary Decl. ¶ 11).

159.    O'Leary was present during the conversation between Rist and White.  Ex. 87 (White Decl. ¶ 4); Ex. 83 (O'Leary Decl. ¶ 11).

160.    Rist has alleged that White told him to "stay away from the sexual harassment complaints he and Michael Picarella had made if he wanted to be promoted."  Ex. 73 (Letter from M. Susswein to Hon. Andrew L. Carter (May 29, 2015) at 1); Ex. 80 (Rist 39:4 – 41:9).

161.    In October 2012, however, when confronted with a similar description of the conversation, Rist stated, "I don't know anything about this," and "this is not accurate."  Ex. 27 (████ 000177 at 77).

162.    At the time of this conversation, White had no knowledge of whether or not Rist had complained to HSBC HR about Hedges' alleged treatment of ████  Ex. 87 (White Decl. ¶ 6).

163.    White was never involved in any decisions concerning Rist's bonuses, reviews, ratings, prospects for advancement or transfer, client assignments, or work duties.  Ex. 87 (White Decl. ¶ 3); Ex. 83 (O'Leary Decl. ¶ 11).

164.    In December of 2012 and January 2013, Rist failed to respond to a series of client e-mails, without which response a transaction could not be completed.  Ex. 35 (HSBCRIST00024906 at 06-07).

165.    Toward the end of 2012, Whang informed Domanko, Fruhbeis, and Bubsy that Rist believed he was being treated differently as a result of the April 18, 2012 incident between his wife and ████  Ex. 82 (Whang 86:9 – 89:4).

166.    At no point did Whang communicate anything to Rist's managers concerning Rist's alleged complaints related to ████ sexual harassment.  Ex. 82 (Whang 88:8 – 89:4).

167.    Indeed, Whang testified that Rist never made any such complaints to her.  Ex. 82 (Whang 88:8 – 89:4, 94:12-16, 96:9-10).

168.    At the time Whang informed Domanko that Rist believed he was being treated differently as a result of the April 18, 2012 incident between his wife and ▮▮▮ Domanko did not know of any complaints Rist alleges he made regarding ▮▮▮ sexual harassment.  Ex. 76 (Domanko 133:18 – 134:14).

169.    At the time Whang informed Fruhbeis that Rist believed he was being treated differently as a result of the April 18, 2012 incident between his wife and ▮▮▮ Fruhbeis did not know of any complaints Rist alleges he made regarding ▮▮▮ sexual harassment.  Ex. 77 (Fruhbeis 122:6-10).

170.    At the time Whang informed Busby that Rist believed he was being treated differently as a result of the April 18, 2012 incident between his wife and ▮▮▮ Busby did not know of any complaints Rist alleges he made regarding ▮▮▮ sexual harassment.  Ex. 84 (Busby Decl. ¶ 22).

171.    In January 2013, Rist's managers believed that comments Rist made to clients were unprofessional and "clearly harms our [HSBC's] goal of building an Equity Finance franchise in Canada."  Ex. 38 (HSBCRIST00004888 at 88).

172.    Rist's year-end 2012 review was discussed with him on or around February 26, 2013.  Ex. 41 (HSBCRIST00000011 at 11).

173.    In his year-end 2012 review, Rist received a rating of "3," although the review noted that "Whilst James's year end rating is a 3 overall we would regard this as a weak 3."  Ex. 41 (HSBCRIST00000011 at 16).

174.    Rist's year-end 2012 review stated:

> 2012 was a mixed year for James.  James has at times struggled to adapt to the change of structure and management within Sales implemented mid 2012 and to the increased focus on pure Sales rather than the traditional EF model of Sales / Trading.  Additionally, James has found that HSBC has not been in a position to

> onboard many of his historic customers . . . . This has at times led him to be less involved with the growth of Prime in the Americas than I believe he would have wished. . . .
>
> As James was aware, from senior management down, 2012 was seen as the year when the focus was predominantly on the monetization of Equities product globally. Unfortunately from a local standpoint we again failed to monetize either the Lat Am product or the EF client franchise in general in the Americas. Whilst his net gnbv showed behind plan overall, the majority of this gnbv was from market counterparts where James provides an important administrative function but is not the primary Sales coverage on the account; net of this revenue the overall contribution was very disappointing at ███████ vs a f'y target of ██████
>
> From an individual perspective James should specifically focus on some areas of weakness identified in 2012. Primary areas of focus are on improving the quality of his order booking, understanding & control of gnbv, and also the clarity of his written communication which can appear vague and / or flippant. There have been instances where James has relayed inaccurate or incomplete information to management regarding customer discussions; this has led to confusion internally and raised concern within Global Prime management.

Ex. 41 (HSBCRIST00000011 at 16).

175.    Rist's year-end 2012 review was completed by McCormick.  Ex. 41 (HSBCRIST00000011 at 11).

176.    At the time he wrote Rist's year-end 2012 review, McCormick did not know of any complaints Rist alleges he made regarding ████ sexual harassment.  Ex. 79 (McCormick 239:6-10).

177.    For 2012, Rist received a bonus of ███████.  Ex. 34 (HSBCRIST00003210).

178.    Rist's 2012 bonus was discretionary.  Ex. 80 (Rist 54:23 – 55:3).

179.    On February 14, 2013, Rist wrote an email to O'Leary concerning the "lack of communication between [Rist] and Paul Busby."  Ex. 40 (Rist001248); Ex. 83 (O'Leary Decl. ¶ 10).

180.    Any alleged report, complaint, or other protected activity by Rist is not contained in this email.  Ex. 40 (Rist001248); Ex. 83 (O'Leary Decl. ¶ 10).

181.    O'Leary did not understand Rist to have complained that he was being treated differently because Rist had complained to HR about the sexual harassment of ▮▮▮ Ex. 83 (O'Leary Decl. ¶10).

182.    In March 2013, Rist was told by Domanko that he was spending too much time away from his desk and needed to set up road shows.  Ex. 42 (HSBCRIST00003467 at 68).

183.    On March 15, 2013, Busby wrote a note to himself that reads, in full:

> I sat down with Jamie to reaffirm the new team structure and my expectations for him to deliver and help build the business.  I asked him to look at the business with a fresh set of eyes ("press reset").  Limit the negativity and the historical challenges and move forward.  He was very frustrated that I hadn't consulted his views and thoughts since my arrival and told him that my door is always open to hear his views and constructive ways to build the business.  I was clear that I am always here and will happily stay back late to brainstorm with him.

> -He addressed concerns with the "my account" issue with the sales traders and I advised that I was not concerned as we would have Barsanti and management (myself, Fruhbeis and O'[L]eary) address directly with the sales traders

> -He stressed that he didn't feel that there was a fair split of account coverage and I would look at balancing with Ted [Langworthy] / Domanko accordingly where it made sense

> The overriding message was that he needs to proactively help develop the platform and drive business forward – arrange client meetings, coordinate internal strategy meetings.  He can't just sit there and wait it come to him….

Ex. 43 (HSBCRIST00003648).

184.    In April 2013, Rist criticized HSBC to a "strategic customer," responding to the client's statement that he could get loans cheaper from sources other than HSBC with, "no way …. i'm gonna kill my guys …" Ex. 45 (HSBCRIST00003734).

185.    On April 3, 2013, Busby wrote a note to himself stating that after giving Rist and Langworthy a task and not hearing back, Busby "asked if Jamie was ready to sit down and review his list at our standing weekly meeting with Todd [Fruhbeis], Rob [Domanko] and I – he said he was ready to go.  He arrived at the meeting unorganized and just with a list of Saudi

PNote clients that he been sent from our colleagues in London a couple of weeks prior. We spent the next 15 minutes reiterating what we needed….. again." Ex. 44 (HSBCRIST00008815).

186.    On May 6, 2013, Rist was told by Domanko that he was taking too many personal days, not providing sufficient notice, and was causing client meetings to be missed. Ex. 46 (HSBCRIST00005470).

187.    On June 14, 2013, Domanko complained to HR that "James Rist and Mike Picarella spend approx. 1hour+ per day loitering by my team's desk. . . . it is not work related. It is disruptive, they are both unproductive, they spend more time chatting and going for coffee than they do working." Ex. 49 (HSBCRIST00003162).

188.    Busby observed Rist and Picarella spending hours together talking in conference rooms on numerous occasions. Ex. 84 (Busby Decl. ¶ 20).

189.    As Rist's manager, Busby determined that there was no business-related reason for Rist and Picarella to spend hours together and away from their desks. Ex. 84 (Busby Decl. ¶ 20).

190.    Like Domanko, Busby felt that this behavior by Rist and Picarella was disruptive. Ex. 84 (Busby Decl. ¶ 20); Ex. 49 (HSBCRIST00003162).

191.    In the summer of 2013, Busby tasked Rist with spearheading a P-Notes project that would enable the team to increase sales in this area. Ex. 84 (Busby Decl. ¶ 16).

192.    It was a sophisticated project and Busby stressed to Rist that he should work collaboratively with others to get it off the ground. Ex. 84 (Busby Decl. ¶ 16).

193.    Despite numerous e-mail exchanges and meetings explaining the steps Rist should take with the project, Rist could not grasp basic concepts for starting the business plan and failed to take the lead in organizing the project. Ex. 84 (Busby Decl. ¶ 16); Ex. 51 (Rist 001544 at 44); Ex. 50 (HSBCRIST00028952 at 52, 55); Ex. 52 (HSBCRIST00003814).

194.    Busby saw the P-Notes project as an example of the fact that Rist lacked the skills expected of someone at Rist's level.  Ex. 84 (Busby Decl. ¶ 16); Ex. 50 (HSBCRIST00028952 at 52); Ex. 51 (Rist 001544 at 44).

195.    In a note Busby wrote himself on June 21, 2013, he noted that Rist "has not taken the lead" on the "PNote project" despite having "been asked on multiple occasions to be point"; that Rist asked "extremely basic questions for some one at a senior level with his tenured experience"; that Rist "Falls constantly behind on projects and initiatives deadlines"; that Rist was "Consistently chased to complete tasks"; and that Rist "had been told on at least 15 / 20 occasions that he needs access to Qlickview to monitor client revenues."  Ex. 50 (HSBCRIST00028952 at 52).

196.    In a note Busby wrote to himself and Domanko on July 22, 2013, he memorialized a meeting the two of them had with Rist in which Busby again explained what the P-Notes project required; noted Rist's frustration with taking on projects and his compensation; noted Rist's reluctance to move forward with the P-Notes project; and noted that a document that Rist sent to him was poorly done: "the design of the tearsheet was poor, not clear messaging and missing all the key axes that we need to disseminate."  Ex. 52 (HSBCRIST00003814).

197.    Rist filed a charge of discrimination with the Equal Employment Opportunity Commission on August 8, 2013.  Ex. 55 (HSBCRIST00000232 at 32).

198.    Exhibit 55 is a true and correct copy of the EEOC Charge, which was not amended.

199.    On August 22, 2013, Domanko received a notification that Rist had failed to complete mandatory training on Anti-Money Laundering.   Ex. 56 (HSBCRIST00003817).

200.   The notification stated that it was Domanko's "responsibility" to ensure that this training occurred on time, and that "senior leaders" would be informed that, due to Rist, Domanko's team was "overdue." Ex. 56 (HSBCRIST00003817).

201.   Rist's mid-year 2013 review was discussed with him on or around September 20, 2013. Ex. 57 (HSBCRIST00000132 at 32).

202.   In his mid-year 2013 review, Rist received a rating of "4 – Inconsistent." Ex. 57 (HSBCRIST00000132 at 35-36).

203.   Rist's mid-year 2013 review noted, "Two primary business objectives were set for James at the beginning of 2013, both of which are not currently on track to be achieved. 1) Account Development: Trade with ▓ new clients in the calendar year (stretch target= ▓ 2) GNBV Budget: ▓ USD (stretch target= ▓. Through July 31, James has traded with ▓ clients and generated sales revenue of ▓" Ex. 57 (HSBCRIST00000132 at 36).

204.   Rist's mid-year 2013 review further noted, "The following additional sales activities and marketing projects were assigned to James in 1H 2013 to help achieve sales. Insufficient effort has been expended on these activities and projects, in some cases due dates have been missed and, to date, none of these activities and projects have been completed or substantially advanced[.]" Ex. 57 (HSBCRIST00000132 at 36).

205.   Rist's mid-year 2013 review further noted that Rist "should be sensitive to how he describes or characterizes our clients. Avoid criticizing the decisions of the Trading desk and management in conversations with clients when we are unable or unwilling to meet client requests." Ex. 57 (HSBCRIST00000132 at 36).

206.   Rist's mid-year 2013 review further noted that Rist needed "a more disciplined approach to time management to be more productive during work hours. Avoid long or frequent

discussions of non-work matters.  Keep extended absences from the desk to a minimum and when necessary, arrange for colleagues to cover Bloomberg chats and phones." Ex. 57 (HSBCRIST00000132 at 36).

207.    Rist's mid-year 2013 review was completed by Domanko.  Ex. 57 (HSBCRIST00000132 at 32).

208.    At the time he wrote Rist's mid-year 2013 review, Domanko did not know of any complaints Rist alleges he made regarding ▮▮▮▮ sexual harassment.  Ex. 76 (Domanko 133:18 – 134:14).



215.    Rist's year-end 2013 review was discussed with him on or around February 24, 2014. Ex. 62 (HSBCRIST00000018 at 18).

26

216.    In his year-end 2013 review, Rist received a rating of "4 – Inconsistent." Ex. 62 (HSBCRIST00000018 at 22).

217.    Rist's year-end 2013 review noted that "he did not meet his revenue and account development targets, and has yet to make significant progress on the projects which he was assigned." Ex. 62 (HSBCRIST00000018 at 22-23).

218.    Rist's year-end 2013 review further noted that, "A second primary objective was account development with a goal of adding ███ new relationships. In terms of new account development directly with James' efforts, we witnessed very little progress: one small cash commission trade with ██████ and no progress on priority accounts like ██████ Ex. 62 (HSBCRIST00000018 at 23).

219.    Rist's year-end 2013 review further noted that, "One area of concern is James' ability to properly manage client expectations, particularly with regard to HSBC trading mandates and limits. One recent example was an order from ██████ in December on two large Mexican stock positions. James displayed poor/average sales skills in managing the client order and he miscommunicated our internal approval process, causing the client to trade away. This was a lost revenue opportunity of $500K+ annualized. Based on James' seniority and experience, we certainly expected more in capturing this opportunity." Ex. 62 (HSBCRIST00000018 at 23).

220.    Rist's year-end 2013 review further noted that, "Despite our discussion at mid-year, James' [sic] also has made very little progress on the projects which were assigned to him and which he acknowledged . . . . There is no indication or updates from James that he is working on the projects. James did not host a road show in 2013. There is also no update or indication that he has planned a marketing road show for 2014, despite numerous requests to do so." Ex. 62 (HSBCRIST00000018 at 23).

221.    Rist's year-end 2013 review further noted that Rist "still needs to work on his time management during office hours. He spends a disproportionate amount of time away from the desk and excessively socializes with others in the work area. This behavior is distracting, demoralizing and sets a poor example for our more junior salespeople." Ex. 62 (HSBCRIST00000018 at 23).

222.    Rist's year-end 2013 review was completed by Domanko. Ex. 62 (HSBCRIST00000018 at 18).

223.    At the time he wrote Rist's year-end 2013 review, Domanko did not know of any complaints Rist alleges he made regarding ███ sexual harassment. Ex. 76 (Domanko 133:18 – 134:14).

224.    For 2013, Rist received a bonus of ███. Ex. 60 (HSBCRIST00003212).

225.    Rist's 2013 bonus was discretionary. Ex. 80 (Rist 55:4-8).

**V.    Rist's Resignation from HSBC (2014)**

226.    Rist received an offer of employment from ███ on May 12, 2014. Ex. 64 (Rist000399 at 99); Ex. 72 (Admissions at Req. 33).

227.    Rist submitted a letter of resignation to HSBC on May 13, 2014. Ex. 72 (Admissions at Req. 34).

228.    Rist left HSBC in order to take the job at ███ Ex. 64 (Rist000399 at 99); Ex. 72 (Admissions at Reqs. 33, 34).

229.    Rist's title at ███ is Director of Prime Finance Sales/Trader. Ex. 72 (Admissions at Req. 35).

230.    Rist's annual salary at ███ is ███. Ex. 72 (Admissions at Req. 36).

231.    Had Rist remained at HSBC, his bonus for 2014 would have been discretionary.   Ex. 80 (Rist 55:9-12).

**VI.      Additional  Relevant Facts**

232.    The sales desk on which Rist worked had a policy in place for calculating GNBV (also known as "sales revenue") as of 2011.  Ex. 6 (HSBCRIST00028850 at 50, 67); Ex. 77 (Fruhbeis 104:22 – 105:8).

█████   █████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

234.    This policy for calculating GNBV remained unchanged in 2012, 2013 and 2014.  Ex. 84 (Busby Decl. ¶ 18).

235.    This policy for calculating GNBV applied to all salespeople for the sales desk on which Rist worked.  Ex. 84 (Busby Decl. ¶ 18).

236.    A salesperson such as Rist could not execute an order because they lack a trading mandate.  Ex. 79 (McCormick 212:8-11); Ex. 83 (O'Leary Decl. ¶ 7).

237.    The revenue performance numbers included in Rist's reviews were pulled from HSBC's systems.  Ex. 77 (Fruhbeis 105:14-20).

238.    The responsibilities of salespeople on the equity finance and prime finance desks included creating marketing materials and pitch books.  Ex. 84 (Busby Decl. ¶ 10); Ex. 76 (Domanko 29:21 – 30:5).

239.    There was not a separate team of employees dedicated to creating marketing materials for the salespeople in the New York office.  Ex. 84 (Busby Decl. ¶ 10).

240.    Busby as Head of Prime Finance Sales personally spent a lot of time developing his own marketing materials and pitch books.  Ex. 84 (Busby Decl. ¶ 10).



243.   The decision as to whether these trades were appropriate for HSBC resided with George and other senior managers.  Ex. 84 (Busby Decl. ¶ 14); Ex. 85 (George Decl. ¶ 4); Ex. 32 (HSBCRIST00030268);  Ex. 33 (HSBCRIST00030238 at 38); Ex. 71 (HSBCRIST00030276 at 78); Ex. 53 (HSBCRIST00030244 at 46).

246.   At the time George made the decision not to proceed with these trades, he did not know of any complaints Rist alleges he made regarding ▊▊▊ sexual harassment.  Ex. 85 (George Decl. ¶ 6).

247.    In or about June 2013, Rist received a discovery request in his divorce proceeding that called for text messages between himself and ███ in which Rist "suspect[ed] there [were] items relating to ███ case." Ex. 48 (███000234 at 34).

248.    Rist, however, had "deleted the texts prior to receiving the document requests." Ex. 48 (███000234 at 34).

249.    Rist's counsel, James Hubbard, responded, "First of all, as I have indicated, you have an obligation to preserve all emails or other communications, texts, etc. that relate in any way to your complaints about ███ treatment by the bank, and the bank's retaliation against you." Ex. 48 (███000234 at 34).

250.    Domanko did not know of any complaints Rist alleges he made regarding ███ sexual harassment until after Rist resigned from HSBC. Ex. 76 (Domanko 133:18 – 134:14).

251.    McCormick did not know of any complaints Rist alleges he made regarding ███ sexual harassment until after Rist resigned from HSBC. Ex. 79 (McCormick 239:6-10).

252.    Busby did not know of any complaints Rist alleges he made regarding ███ sexual harassment until after Rist resigned from HSBC. Ex. 84 (Busby Decl. ¶ 22).

253.    ███ was no longer employed at HSBC when Busby joined HSBC in July 2012. Ex. 84 (Busby Decl. ¶ 21); Ex. 65 (Compl. ¶ 13); Ex. 66 (Answer ¶ 13).

254.    George did not know of any complaints Rist alleges he made regarding ███ sexual harassment until after Rist resigned from HSBC. Ex. 85 (George Decl. ¶ 6).

255.    O'Leary did not know of any complaints Rist alleges he made regarding ███ sexual harassment until after Rist resigned from HSBC. Ex. 83 (O'Leary Decl. ¶¶ 8-9).

256.    Pizzimbono did not know of any complaints Rist alleges he made regarding ███ sexual harassment until after Rist resigned from HSBC. Ex. 86 (Pizzimbono Decl. ¶¶ 6-7).

257.   Fruhbeis did not know of any complaints Rist alleges he made regarding ███ sexual harassment until after Rist filed his EEOC Charge.  Ex. 77 (Fruhbeis 122:6-10).

258.   Rist has no personal knowledge or direct evidence that Busby had retaliatory intent.  Ex. 80 (Rist 14:19 – 17:2).

259.   Rist has no personal knowledge or direct evidence that Domanko had retaliatory intent.  Ex. 80 (Rist 17:3 – 21:25).

260.   Rist has no personal knowledge or direct evidence that Fruhbeis had retaliatory intent.  Ex. 80 (Rist 22:13 – 23:21).

261.   Rist has no personal knowledge or direct evidence that McCormick had retaliatory intent.  Ex. 80 (Rist 34:22 – 37:5, 42:4-14).

262.   Rist's belief that McCormick had retaliatory intent is based on "a lot of speculation."  Ex. 80 (Rist 36:22 – 37:5).

263.   Rist has no personal knowledge or direct evidence that Pizzimbono had retaliatory intent.  Ex. 80 (Rist 42:15 – 44:14).

264.   White was not involved in any decisions or actions that Rist claims were retaliatory.  Ex. 87 (White Decl. ¶ 3).

265.   White did not know of any complaints Rist alleges he made regarding ███ sexual harassment until after Rist resigned from HSBC.  Ex. 87 (White Decl. ¶ 6).

Dated: June 12, 2015                    /s/ Damien J. Marshall
                                        Damien J. Marshall
                                        Camille Oberkampf
                                        Ilana Miller
                                        Joshua J. Libling
                                        BOIES, SCHILLER & FLEXNER LLP
                                        575 Lexington Avenue
                                        New York, New York 10022
                                        Phone: (212) 446-2300
                                        dmarshall@bsfllp.com
                                        coberkampf@bsfllp.com
                                        imiller@bsfllp.com
                                        jlibling@bsfllp.com

                                        Eugene Scalia
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue, NW
                                        Washington, District of Columbia 20036
                                        Phone: (202) 955-8206
                                        Facsimile: (202) 530-9606
                                        escalia@gibsondunn.com

                                        *Attorneys for HSBC Securities (USA) Inc.*